GREATER HOUSTON TRANSPORTATION COMPANY, INC., Appellant,

v.

Ernest W. ZRUBECK, Appellee.

No. 13–91–426–CV.

Court of Appeals of Texas, Corpus Christi.

Feb. 4, 1993.

Rehearing Overruled April 8, 1993.

Frank G. Harmon, III, Houston, Kathleen Hopkins Alsina, Crain, Caton & James, Houston, for appellee.

Before GILBERTO HINOJOSA, DORSEY and FEDERICO G. HINOJOSA, Jr., JJ.

## OPINION

GILBERTO HINOJOSA, Justice.

Appellant, Greater Houston Transportation Company, complains by seven points of error of the trial court's rendition of judgment based on a jury verdict finding it grossly negligent. We affirm.

Greater Houston Transportation Company, a subsidiary of Yellow Cab Service Corporation, contracted with MetroLift to provide curb-to-curb transportation for the elderly, handicapped and mentally retarded. Mr. Zrubeck, appellee, sued Greater Houston for negligence and gross negligence, claiming that Greater Houston neither adequately trained nor impressed upon its drivers the importance of securing wheelchair clients to their wheelchairs with seat belts. On the court's motion, and without objection from the parties, the issues of gross negligence and the amount of exemplary damages were tried separately and submitted in a bifurcated charge. The jury found Greater Houston grossly negligent and awarded $175,000 in actual damages and $500,000 in exemplary damages.

Greater Houston appeals by seven points of error: the trial court erred in 1) failing to poll the jury upon request, 2) entering judgment because the same ten jurors did not concur on all the answers in the verdict, 3) entering judgment based on the jury's assessment of actual damages, 4) entering judgment because there is no evidence or insufficient evidence of Greater Houston's negligence, 5) entering judgment because there is no evidence or insufficient evidence of Greater Houston's gross negligence, 6) entering judgment on gross negligence and exemplary damages because there is no evidence or insufficient evidence that Greater Houston's driver and employee were grossly negligent, and 7) the

J. Preston Wrotenbery, Hirsch, Glover, Robinson & Sheiness, Houston, for appellant.

award of exemplary damages is excessive. We overrule all points of error.

At the time of the incident in question, Ernest Zrubeck was a 53 year-old quadriplegic. He had suffered a broken neck as a result of an auto accident when he was 17 years of age, which left him with minimal feeling below the fifth vertebrae. Mr. Zrubeck had some feeling in both arms, but could only use his shoulders while sitting up. When he was younger, Mr. Zrubeck was independent and even drove his own automobile. His condition steadily declined until he had to move into a nursing home twelve years before the MetroLift incident.

In the nursing home, Mr. Zrubeck was completely dependent. When in a prone position, orderlies had to turn him over every two hours to avoid bed sores and other complications. However, sitting up, he could wheel himself around and enjoyed sitting in the sun. On almost all excursions from the nursing home, he would ride in a family automobile, with his wheelchair folded in the trunk. Medicare paid for Mr. Zrubeck's nursing home expenses, leaving him approximately $25 per month spending money. He had no outside sources of income.

Mr. Zrubeck had the same manual wheelchair for twenty years prior to this incident. It had a "lap tray" for reading, writing and eating. The "lap tray" was not a device intended for safety purposes. Basically, it was a flat tray that could slide off the arms of his wheelchair. Mr. Zrubeck demonstrated at trial that he could take the tray off unassisted. The tray did not have a lock that would prevent it from coming off accidentally.

On September 7, 1986, Miss Loretta Lee, a Greater Houston driver, arrived at a nursing home to transport Mr. Zrubeck to his sister's house. Using a motorized lift, she helped Mr. Zrubeck into the MetroLift van and properly secured his wheelchair to the railway. She testified that, when she removed a seat belt from her bag, Mr. Zrubeck said that he did not need it. He said that he always rode without one and that his "securement was good." Miss Lee stated that Mr. Zrubeck had a "biball"—a

piece of wood around his body to hold him up—and that she checked it and was satisfied that it was snug. During trial, it was established that she was referring to Mr. Zrubeck's "lap tray."

At trial, Mr. Zrubeck denied that a conversation with Miss Lee about whether to wear a seat belt ever occurred. In fact, Mr. Zrubeck testified that, of the three or four times he used MetroLift, he had never been offered a seat belt.

En route to their destination, Miss Lee was forced to stop suddenly when a car in front of the van stopped to make a U-turn. She testified that the speed limit was 35 m.p.h., that she was following at a distance of approximately two car-lengths and that it was misting. As soon as she stopped, she saw Mr. Zrubeck slide feet-first out of his wheelchair until the lower half of his body was on the floor of the MetroLift van. The wheelchair never moved. Mr. Zrubeck testified that he called to Miss Lee to tell her he had fallen.

Miss Lee turned on the emergency flashers, put the van in park and briefly left it to get help. She first testified that she tried to lift Mr. Zrubeck but could not. Subsequently, she testified that she did not try to lift him because she was afraid she would hurt him, and that a police officer helped her return him to his wheelchair.

Miss Lee secured Mr. Zrubeck with a seat belt. She repeatedly asked him if he wanted to go to the hospital. It is undisputed that Mr. Zrubeck repeatedly declined these offers. He said that he was "fine" and that he just wanted to go to his sister's house. After dropping off Mr. Zrubeck, Miss Lee immediately reported the incident to Greater Houston.

Mr. Zrubeck testified that at the time of the incident he felt no pain. But, at his sister's house, he began to "feel bad." Consequently, his sister called MetroLift, and he was returned to the nursing home.

Two or three days later, Mr. Zrubeck began having a hard time wheeling his chair. Five days after the incident, the nursing home called his doctor. Mr. Zrubeck was extremely pale, and his legs were

deformed and grossly swollen. His doctor sent him to the hospital for x-rays which revealed that he had broken both of his legs. His right leg had a fractured femur, tibia and fibia. His left leg had a fractured tibia and fibia. After forty years of paralysis, the bones in Mr. Zrubeck's legs were very brittle.

Mr. Zrubeck was in the hospital for six days while his doctors determined the best way to treat his fractures. The total cost of his stay at the hospital was $6,200. During that time, he received a blood transfusion because a considerable amount of blood had drained into the wound area. Mr. Zrubeck's doctor testified that he had very few veins in his arms and that he could feel the pain of the needles probing for a vein.

After leaving the hospital, Mr. Zrubeck spent approximately two weeks in physical therapy. He was confined to his bed for three to four months. During that time, he was completely unable to perform even the simplest tasks. He became extremely depressed. His doctor testified that Mr. Zrubeck did not return to his pre-accident mobility for "quite a while."

Mr. Zrubeck's doctor testified that, as a result of his paralysis, his legs are not expected to heal. X-rays taken shortly before trial show that his bones continue to have deformities. To avoid further displacement, extra care will be required when moving him. The likelihood is much greater that the orderlies who turn him over every two hours will injure him. As a result, Mr. Zrubeck can no longer ride in family vehicles, but must spend a substantial portion of his meager allowance on MetroLift transportation. Because he has weakened considerably, he now has an electric wheelchair.

Greater Houston trained its drivers with regard to proper handling of MetroLift vans and customers. First, the drivers studied safe driving skills for eight hours. Second, they received eight hours of instruction for passenger assistance and sensitivity training. This portion of instruction emphasized behavior such as, "don't ever embarrass a passenger," "offer assistance, but do not insist," and "give passengers the benefit of the doubt." Third, they participated in two eight-hour days of on-the-road training. And, fourth, they had two-to-four hours of company orientation, which emphasized company policies. After completion of training, but prior to issuance of an identification badge, trainees had to sign for the receipt of a safety handbook issued by MetroLift.

The adoption of the safety guidelines in this MetroLift handbook was a condition of Greater Houston's contract. The thirty-six-page handbook repeatedly and clearly stated in underlined and capital letters that all wheelchair passengers had to be secured to their wheelchairs with snug-fitting seat belts to prevent the passengers from sustaining injuries.[1] Miss Lee testified that attaching a seat belt only required approximately twenty seconds.

The MetroLift handbook unequivocally mandated that a driver was to call a supervisor if a passenger refused to wear a seat belt.[2] However, Miss Lee's supervisor at the time of his deposition could not recall this specific policy. Although he testified that he had copies of the handbook in his office, he stated that the policy provided that if there was a "problem," then the driver was to call the dispatcher.

Greater Houston did not deny that their policy was "no belt, no ride." In fact, Greater Houston had developed their own seat belt design.

Nonetheless, Miss Lee testified that many MetroLift drivers, including herself, regularly permitted wheelchair passengers to ride without seat belts. The justification she gave was that these particular passengers had their own "restraining devices" that in some way secured them to their wheelchairs. Out of courtesy to these cus-

---

1. The wheelchairs were clamped onto a railway in the van. The theory was that the passengers would be safe if they were secured to an immovable wheelchair with a seat belt.

2. The MetroLift handbook stated: "Advise the driver supervisor if a passenger has not or will not conform to this [seat belt] requirement."

tomers, if they declined a seat belt, then MetroLift drivers did not refuse transportation. However, the evidence showed that many of these "restraining devices" were merely intended to keep erect an individual who otherwise could not sit up unassisted.

Miss Lee's supervisor was aware that approximately 25% of the MetroLift wheelchair customers had such "restraining devices." Yet trainees were not taught to distinguish "restraining devices" from actual safety devices. Whether drivers had discretion to substitute a "restraining device" for a safety device was not addressed during training, either.

The undisputed evidence showed that the policy at Greater Houston was that, if an employee failed to use a seat belt, this resulted in automatic termination of employment.[3] To encourage compliance with its safety policies, inspectors would occasionally ride the vans.

Despite the automatic termination policy, Miss Lee was merely suspended without pay for approximately two weeks, pending an investigation. Greater Houston determined that, "in effect," she had used a seat belt because Mr. Zrubeck had his own "restraining device." Miss Lee was permitted to return to work and was eventually promoted to the position of "driver supervisor."

At trial Miss Lee testified that, even though 25% of the wheelchair passengers had their own "restraining devices," she had never discussed using seat belts with anyone at Greater Houston before the incident. She knew that company policy required seat belts, but she did not know until after the incident that failure to use

them was grounds for termination. Even after the investigation, she did not know that, pursuant to the MetroLift handbook, a driver was required to call a driver supervisor if a passenger refused to wear a seat belt. In fact, at her deposition, she stated that she had never seen the MetroLift handbook.

One jury tried the case in a bifurcated trial.[4] The first trial assessed Greater Houston's negligence, gross negligence and actual damages. By a vote of eleven to one, the jury found Greater Houston grossly negligent and 75% responsible for Zrubeck's injuries. The second trial assessed exemplary damages. Ten jurors, including one who voted against liability in the first trial, assessed exemplary damages totalling $500,000 against Greater Houston. Thus, the same ten jurors did not concur on the issues of liability and exemplary damages tried in the separate trials.

Greater Houston argues in its first point of error that the trial court erred in failing to poll the jury upon request after the second trial. It refers to the explicit language of TEX.R.CIV.P. 294 [5] and to case law to argue that the right to have the jury polled is absolute and that the trial court has no discretion in the matter once a request is made. *Pate v. Texline Feed Mills, Inc.,* 689 S.W.2d 238, 243 (Tex.App.—Amarillo 1985, writ ref'd n.r.e.); *Watchtower Mutual Life Ins. Co. v. Davis,* 99 S.W.2d 693, 695 (Tex.Civ.App.—Fort Worth 1936, no writ). We overrule Greater Houston's first point of error because 1) it waived its right to poll the jury, 2) it failed to preserve error, if any, and 3) the error, if any, was harmless.

---

**3.** The MetroLift handbook stated: "[Failure to use a seat belt] ... is so serious that a single violation will mean the loss of you [sic] job."

**4.** During oral argument, appellant indicated that the trial court ordered the bifurcated trial on its own motion, out of the presence of the court reporter, and that neither party objected to the motion. Appellant stated that Greater Houston was not challenging the bifurcation of the trial.

**5.** TEX.R.CIV.P. 294 entitles a party to have the jury polled when the verdict is returned:

Any party shall have the right to have the jury polled. A jury is polled by reading once to the jury collectively the general verdict, or the questions and answers thereto consecutively, and then calling the name of each juror separately and asking the juror if it is the juror's verdict. If any juror answers in the negative when the verdict is returned signed only by the presiding juror as a unanimous verdict, or if any juror shown by the juror's signature to agree to the verdict should answer in the negative, the jury shall be retired for further deliberation.

■ To properly preserve error for consideration on appeal, Tex.R.App.P. 52(a) requires a timely objection, or request, and a ruling by the court. If a trial judge refuses to rule, an objection to the court's refusal to rule is sufficient to preserve the complaint. *Id.*

■ The record clearly illustrates that Greater Houston failed to secure a ruling from the trial judge when the trial court failed to poll the jury. After the jury returned with the second charge, Mr. Ireland, Greater Houston's attorney, participated in the following dialogue:

Mr. Ireland: May the jury be polled?

The Court: Eleven have signed it.

Mr. Ireland: We would like to make sure the 11–1 is the same as the 10–2 on the others, but we will check it.

The Foreman: It's not.

The Court: Won't make a difference. There is one juror that did not sign the original verdict but signed this one, but it does not have to be the same eleven, it can be a different 10–2 verdict.

The trial court discharged the jury without further demand to poll the jury and without further motion or objection by Mr. Ireland.

We hold Greater Houston failed to preserve error. The trial court never ruled that it would not poll the jury. Greater Houston did not request a ruling; nor did it object to the trial court's failure to poll the jury. The right to have the jury polled may be absolute, as Greater Houston argues, but if the error is not preserved, then a court of appeals cannot address it. Tex. R.App.P. 52(a).

■ In any event, if Greater Houston properly preserved error, it waived its right to have the jury polled. Waiver occurs when a party intentionally relinquishes a known right. In *Wilkerson v. Darragh & Lyda, Inc.*, a party requested that the trial court poll the jury. *Wilkerson v. Darragh & Lyda, Inc.*, 408 S.W.2d 542, 545 (Tex.Civ. App.—San Antonio 1966, writ ref'd n.r.e.). The party did not approve of the manner in which the jury was polled. However, be-cause it did not timely object in order to give the trial judge an opportunity to correct any errors, the appellate court held that the party had waived its right to complain of the failure to properly poll the jury. *Id.*

■ We hold Greater Houston waived its right to have the jury polled when it ceased its pursuit of a polling after an explanation was given by the trial judge. Greater Houston was aware of its right to have the jury polled because it asserted that right after the second charge was returned. It wanted to know whether the ten jurors who signed the first verdict were the same jurors who signed the second verdict. The jury foreman answered that they were not the same. Then the court stated that it would make no difference because the jurors did not have to be the same. After these explanations, Greater Houston ceased its pursuit of a polling and made no further objections or motions. Thus, Greater Houston voluntarily relinquished its right to poll the jury. *Id.*

■ In any event, even if there was error, we hold that any such error was harmless because it did not cause the rendition of an improper judgment in the case. Tex. R.App.Proc. 81(b)(1); *Wilkerson,* 408 S.W.2d at 544. Greater Houston argues that if the trial judge had polled the jurors it would have confirmed that the same ten jurors did not concur as to all of the issues, prompting the trial judge to return the jury for further deliberation in an attempt to be in compliance with the requirements of Rule 292. However, the record indicates that the trial judge approved the two verdicts. He stated that "it does not have to be the same eleven...." The trial judge was already aware that the same ten jurors did not concur on all the issues. Thus, even if the jury had been polled, the trial judge would not have returned the jury for further deliberation on those grounds. Error, if any, by the trial court's failure to poll was harmless. Greater Houston's first point of error is overruled.

By its second point of error, Greater Houston argues that the trial court erred in entering judgment because the same ten

jurors who found gross negligence in the first verdict did not award exemplary damages in the second verdict. Citing *McCauley v. Charter Oak Fire Ins. Co.*, Greater Houston argues that TEX.R.CIV.P. 292[6] mandates that the same ten jurors answer each and all of the issues upon which the court bases its judgment. *McCauley v. Charter Oak Fire Ins. Co.*, 660 S.W.2d 863, 866 (Tex.App.—Tyler 1984, writ ref'd n.r.e.); *accord Gonzalez v. Gutierrez*, 694 S.W.2d 384, 391 (Tex.App.—San Antonio 1985, no writ). Greater Houston asserts that error was preserved because the trial court erred in failing to poll the jury, and that the latter error was preserved. It reasons that failing to poll the jury deprived Greater Houston of the opportunity to have the jury return for further deliberation. Greater Houston argues this first error caused the second. We disagree with this analysis.

▇▇ Certain errors in the jury's verdict must be brought to the trial court's attention before the jury is discharged. The errors in this class of cases are those which may be cured by further deliberation. *See Continental Casualty Co. v. Street*, 379 S.W.2d 648, 650 (Tex.1964); *Lewis v. Texas Employers' Ins. Ass'n*, 151 Tex. 95, 246 S.W.2d 599, 600–01 (1952). For example, if the jury returns with an incomplete verdict, the party aggrieved by the incomplete answers must object to the verdict and move for further deliberation or a mistrial before the jury is discharged. *See Fleet v. Fleet*, 711 S.W.2d 1, 3 (Tex.1986). The aggrieved party could also preserve error by requesting additional instructions or issues, by requesting that the jury be instructed to answer the unanswered questions, or by objecting to the trial court's acceptance of the verdict. *See Estate of Clifton v. Southern Pac. Transp. Co.*, 709 S.W.2d 636, 639 (Tex.1986). These objections make the trial court aware of the error, and the party's desire to have it corrected at a time when it is feasible to do so. *See* TEX.R.APP.P. 52(a).

▇▇ Similarly, if the jury returns a verdict containing inconsistent answers, a party must make a proper objection or otherwise bring to the court's attention this fact before the verdict is accepted and received and the jury is discharged. For example, in *Texas Employers' Ins. Ass'n v. King*, the jury returned with findings on special issues that a worker's compensation claimant was temporarily and totally incapacitated as well as permanently and partially incapacitated. *Texas Employers' Ins. Ass'n v. King*, 346 S.W.2d 380, 381 (Tex. Civ.App.—Amarillo 1961, writ ref'd n.r.e.). After silently reading the issues and answers, and without consulting the attorneys, the trial judge instructed the jury that there was a conflict in their answers and that they were to retire for further deliberation. *Id.* After further deliberation, the jury found the claimant totally and permanently disabled. *Id.* The trial court accepted the verdict and discharged the jury. *Id.*

The appellant in *King* argued that, substantively, there was in fact no conflict when the jury first returned. *King*, 346 S.W.2d at 382. However, he did not object to the trial court's actions before the court discharged the jury. *Id.* Instead, the appellant's lawyer brought the conflict to the trial court's attention one week after the verdict was filed of record. *Id.* Noting that appellant could have requested to see the first verdict and that time was available for proper objections up to the time the jury was discharged, the court held that it was incumbent upon appellant to preserve error with a timely objection. *Id.* Therefore, appellant had failed to preserve error for review by the appellate court. *Id.*

▇▇ Similarly, we hold that Greater Houston failed to preserve error. It possessed all the information it needed to object to the court's acceptance of the verdict before the jury was released. The court expressly informed Greater Houston that there was one juror that signed the second verdict that did not sign the first verdict.

---

**6.** The pertinent portion of TEX.R.CIV.P. 292 provides: "A verdict may be rendered in any cause by the concurrence, as to each and all answers made, of the same ten members of an original jury of twelve...."

Because Greater Houston failed to object to any perceived conflicts between the verdicts while the error could be cured by further deliberation, it failed to preserve error for appellate review. *King*, 346 S.W.2d at 382.

■ In any event, even if error were properly preserved, our disposition of this point of error would not change. Greater Houston argues that a bifurcated trial is one trial and that TEX.R.CIV.P. 292, *McCauley* and *Gonzalez* mandate that the same ten jurors answer each and all of the issues upon which the court bases its judgment. *McCauley*, 660 S.W.2d at 866; *Gonzalez*, 694 S.W.2d at 391. We disagree. *McCauley* and *Gonzalez* address the concurrence of jurors' answers within the *"same trial."* However, this case was a "separate trial" as contemplated in TEX.R.CIV.P. 174(b). And, TEX.R.CIV.P. 292 does not require concurrence between "separate trials." Thus, Greater Houston waived the right to complain of any *McCauley* problems when it agreed to a bifurcated trial.

The authority to grant a bifurcated trial is found in TEX.R.CIV.P. 174(b).[7] Rule 174(b) provides that, in order to avoid prejudice, the court may order a separate trial of any separate issue. The justification for the bifurcation of the issues of liability and exemplary damages is to avoid prejudice. Advocates of bifurcated trials argue that the defendant's net worth prejudices the jury in its determination of liability.[8] Thus, a trial court granting a bifurcated trial does so pursuant to Rule 174(b).

We give a literal meaning to the words "separate trial" under TEX.R.CIV.P. 174(b). Regardless of the trier of fact, a separate trial under TEX.R.CIV.P. 174(b) remains a full and final trial on the issues. *Phipps v. Miller*, 597 S.W.2d 458, 460 (Tex.Civ.App.—Dallas 1980, writ ref'd n.r.e.). Whether a separate trial is tried to the same jury, a different jury or the trial court does not affect its status. *See Humphrey v. Humphrey*, 593 S.W.2d 824 (Tex.Civ.App.—Houston [14th Dist.] 1980, writ dism'd); *W.H. Simpson v. Phillips Pipe Line Co.*, 603 S.W.2d 307 (Tex.Civ.App.—Beaumont 1980, writ ref'd n.r.e.); *Credit Plan Corp. of Houston v. Gentry*, 516 S.W.2d 471 (Tex.Civ.App.—Houston [14th Dist.] 1974), *rev'd on other grounds*, 528 S.W.2d 571 (Tex.1975); *Walker v. Showalter*, 503 S.W.2d 624 (Tex.Civ.App.—Houston [1st Dist.] 1973, no writ); *Utilities Natural Gas Corp. v. Hill*, 239 S.W.2d 431 (Tex.Civ.App.—Dallas 1951, writ ref'd n.r.e.).

Trying a separate trial to the same jury streamlines what is essentially a different trial. A trial judge has authority pursuant to TEX.R.CIV.P. 174(b) to empanel a different jury. But, if a bifurcated trial were tried to different juries, it would entail, at a minimum, a second voir dire and reintroduction of the same evidence. Compara-

---

7. TEX.R.CIV.P. 174(b) provides:

 (b) Separate Trials. The court in furtherance of convenience or to avoid prejudice may order a separate trial of any claim, cross claim, or third party claim, or of any separate issue or of any number of claims, cross claims, counterclaims, third party claims, or issues.

8. This argument is an example of the "Wyoming Plan," in which the evidence of a defendant's net worth is offered only after the jury makes a preliminary finding of gross negligence. Texas has expressly rejected the practice of bifurcating trials on the questions of liability and damages. *Eubanks v. Winn*, 420 S.W.2d 698, 701 (Tex. 1967); *Iley v. Hughes*, 158 Tex. 362, 311 S.W.2d 648, 650 (1958). And for good reason: the issues involved in assessing liability and damages are not severable, but are, in fact, inherently interrelated. *Eubanks*, 420 S.W.2d at 701. Nonetheless, some continue to insist that the

Wyoming Plan is appropriate for Texas practice. *Lunsford v. Morris*, 746 S.W.2d 471, 475 (Tex. 1988) (Gonzalez, J. dissenting). We disagree.

The "Wyoming Plan" sells short the jury's capacity to follow instructions in the charge. A typical charge initially instructs the jurors not to let prejudice play a part in their deliberations. They are also informed that their conduct is subject to review. As a result of these instructions, reasonable jurors would disregard evidence of a defendant's net worth in the determination of liability. Whether a particular juror is likely to be prejudiced by a defendant's net worth, or capable of disregarding evidence of a defendant's net worth in determining liability, is a subject appropriately addressed in voir dire. Furthermore, jurors are regularly instructed to disregard prejudicial evidence during trial. It is inconsistent to assume that a juror is capable of disregarding the proverbial "skunk in the jury box" yet incapable of disregarding a defendant's net worth during deliberations.

tively, trying the second trial to the same jury avoids a second voir dire and permits the attorneys to move to admit all evidence from the first trial into evidence in the second trial. With today's crowded dockets, consolidation to avoid delay and encourage judicial economy is at a premium. That the trial court elects not to waste time in needless voir dire and reintroduction of evidence should not operate to the detriment of any parties. Requiring concurrence between two separate verdicts would work a hardship on the parties when a trial judge exercises her or his authority pursuant to Rule 174(b).

Likewise, requiring concurrence between two separate verdicts violates the rights guarded by Tex.R.Civ.P. 292 because it unfairly increases the plaintiff's burden of persuasion. Rule 292 only requires a plaintiff to persuade *any* ten jurors out of a pool of twelve. But requiring concurrence between two separate verdicts dictates that, in the second trial, there must be concurrence among the *same* ten members of the original jury of twelve. For example, in the event of a 10–2 verdict in the first trial, concurrence between two separate verdicts would require a plaintiff to convince the *same ten* jurors of the additional fact in issue in the second trial. Comparatively, in order to obtain a verdict against the plaintiff, the defense is merely required to persuade *one* juror voting for the plaintiff in the first trial that the fact in issue in the second trial is not established. Normally, the defense is required to persuade three jurors to vote against the plaintiff to obtain a verdict against the plaintiff. Furthermore, the two jurors originally voting against the plaintiff would be superfluous and would only operate to

confuse the original ten jurors during the second deliberation.

We hold that a second trial to the same jury conducted pursuant to Tex.R.Civ.P. 174(b) is a separate trial; thus, concurrence of the same ten jurors as contemplated in Tex.R.Civ.P. 292 is not required. Greater Houston waived its right to complain of any *McCauley* errors when it failed to object to the bifurcated trial. Greater Houston's second point of error is overruled.

Greater Houston's third point complains that the evidence was legally and factually insufficient to support the jury's assessment of $175,000 in actual damages. The charge instructed the jurors to consider particular elements of actual damages, but did not request the jury to assess a dollar figure for each element. Thus, the jury's actual damages award was one lump sum, with the constituent parts indistinguishable.[9] The jury awarded $150,000 for past damages and $25,000 for future damages.

Although Greater Houston preserved its right at trial to complain of the sufficiency of the evidence to support the damages award, it waives that right on appeal with regard to two important elements. Greater Houston addressed the sufficiency of the evidence with regard to physical pain, loss of earning capacity, mental anguish and medical care, but offers no argument whatsoever with regard to disfigurement and physical impairment, two of the elements the jurors were instructed to consider.

 One damage question may include several closely related elements of total damage. *Kulms v. Jenkins*, 557 S.W.2d 149, 154 (Tex.Civ.App.—Amarillo 1977, writ ref'd n.r.e.); 4 McDonald, Texas Civil Practice § 22.33[c] (1992). A party

---

**9.** The jury answered the damages question as follows:

What sum of money, if paid now in cash, would fairly and reasonably compensate Ernest Zrubeck for his injuries, if any, which resulted from the occurrence in question?

Consider the elements of damages listed below and none other. Consider each element separately. Do not include interest on any amount of damages you find.

 a. Physical pain and mental anguish.
 b. Loss of earning capacity.
 c. Disfigurement.
 d. Physical impairment.
 e. Medical care.

Do not reduce the amounts, if any, in your answers because of the negligence, if any, of Ernest Zrubeck.

Answer in dollars and cents for damages, if any that—

were sustained in the past: Answer: $150,000
in reasonable probability will
be sustained in the future: Answer: $25,000

may phrase a damage question in terms of the elements to be considered. McDonald, § 22:33[c]; *see* 1 State Bar of Texas, TEXAS PATTERN JURY CHARGES PJC 7.02 (1991) (Comment). When the total actual damages is in one question, and the jurors are instructed to consider particular elements, an answer by the jury as to each element is not required to support a verdict. *See Kulms v. Jenkins,* 557 S.W.2d at 154; *Kansas City Southern Ry. Co. v. Catanese,* 778 S.W.2d 114, 118 (Tex.App.—Texarkana 1989, writ denied). To the contrary, TEX.R.CIV.P. 277 dictates that, even in a damages question, "the court shall, whenever feasible, submit the cause upon broad-form questions." *Catanese,* 778 S.W.2d at 118.

The problem this Court faces is that, when a damages issue is submitted in broad-form, an appellate court cannot ascertain with certainty what amount of the damages award is attributable to each element. *See Kansas City Southern Ry. Co. v. Carter,* 778 S.W.2d 911, 916 (Tex.App.—Texarkana 1989, writ denied). Furthermore, when the elements of actual damages considered by the jury include the more amorphous, discretionary damages, e.g., mental anguish, pain and suffering, physical impairment and disfigurement, any amount awarded above the more definitive damages, such as past medical expenses and lost wages, will be shunted to the discretionary domain of the jury.[10] *See Kneip v. UnitedBank–Victoria,* 774 S.W.2d 757, 760 (Tex.App.—Corpus Christi 1989, no writ) (mental anguish is necessarily a speculative claim left to a jury's determination); Powers and Ratliff, *Another Look at "No Evidence" and "Insufficient Evidence,"* 69 TEX.L.REV. 515, 566 (1991). Thus, under the current practice, a meaningful review on appeal of damages questions submitted in broad-form is extremely difficult.[11]

■ The only way that a defendant can successfully attack a multi-element damages award on appeal is to address each and every element and show that not a single element is supported by sufficient evidence. If there is just one element that is supported by the evidence, the damages award will be affirmed if it is supported by the evidence.

■ In the instant case, the defendant did not address disfigurement or physical impairment in its argument on appeal. Thus, the right to complain of the insufficiency of these elements of damage has been waived. And, since they are of the amorphous, discretionary variety, we are not at liberty as an appellate court to impose upon the discretion of the jury. *See, e.g., Kneip,* 774 S.W.2d at 760. We hold that Greater Houston has waived any complaint concerning the sufficiency of the evidence regarding actual damages by failing to request findings on each element of damages, and by failing to address all of the elements of damage in its argument.

In any event, we hold that legally and factually sufficient evidence supports the award for damages. Logically, if the aggregate evidence supporting the elements in the question is insufficient to sup-

---

10. In cases dealing with amorphous, discretionary elements of actual damages, a no evidence challenge to the elements submitted in a damages question at the charge stage to exclude a particular element is critical. *See* TEX.R.CIV.P. 278. Objections to instructions in the charge cannot be presented for the first time on appeal. TEX.R.CIV.P. 272; TEX.R.APP.P. 52(c)(3); *Estate of Arrington v. Fields,* 578 S.W.2d 173 (Tex.Civ.App.—Tyler 1979, writ ref'd n.r.e.); McDonald, § 22:47[b]. And, a trial judge is in a more appropriate position than the appellate court to find no evidence to support a discretionary damages element.

11. If there were a finding by the jury regarding the amount of the damages award allotted to each particular element, the appellate court's review would be more meaningful. However, submitting damages elements in separate questions has been rejected in many cases. The Courts have held that a defendant is not entitled to have each item of closely related elements separately submitted. *See Catanese,* 778 S.W.2d at 118; *Kulms,* 557 S.W.2d at 154; McDonald, § 22:33[c]. Yet in *Celotex Corp. v. Tate,* the Court held that, absent separate findings on each constituent element of the jury's punitive damages award, it was powerless to review the damages issue. *Celotex Corp. v. Tate,* 797 S.W.2d 197, 209 (Tex.App.—Corpus Christi 1990, no writ).

port the jury's finding of $175,000, we cannot sustain the damages award. Accordingly, we will determine whether the cumulative weight of the evidence supporting these elements is sufficient to support the jury's assessment of $175,000 in damages.

When reviewing a jury verdict to determine the *factual sufficiency of the* evidence, the Court of Appeals must consider and weigh all the evidence, and should set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain,* 709 S.W.2d 175, 179 (Tex.1986); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951). Thus, we will summarize the evidence pertaining to actual damages.

The evidence showed that Mr. Zrubeck suffered two broken legs, which caused severe internal bleeding. He was in the hospital for six days, during which time he underwent blood transfusions. His doctor testified that Mr. Zrubeck could feel the pain caused by the needles probing for the few veins in his arms. Upon leaving the hospital, he was in physical therapy for two weeks and was completely bedridden for three consecutive months in the nursing home. Because he had weakened considerably, Mr. Zrubeck acquired an electric wheelchair. He suffered severe depression. His total medical expenses as a result of the accident were $6,200.

As a result of his paralysis, Mr. Zrubeck's broken legs are unlikely to heal. When moving him, orderlies and family members must take extreme precautions because future displacements are likely. Because of his fragile condition, Mr. Zrubeck can only travel in MetroLift vans, which cost money, and he can no longer go on family excursions in their automobiles.[12]

This evidence was sufficient for the jury to find that Zrubeck suffered physical pain, physical impairment and mental anguish in the past. The evidence showed he clearly had resultant medical bills. The evidence was also sufficient for the jury to find that

Zrubeck would suffer physical impairment and mental anguish in the future. The jury's findings are not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain,* 709 S.W.2d at 179; *In re King's Estate,* 244 S.W.2d at 661. Accordingly, we hold that the evidence is legally and factually sufficient to support the jury's assessment of $175,000 as compensation for actual damages. Point of error three is overruled.

Greater Houston contends by its fourth point of error that no evidence or insufficient evidence of negligence exists; by its fifth and sixth points of error, it argues that no evidence or insufficient evidence supports a jury finding of gross negligence on the part of Greater Houston or its employees. We overrule these points of error.

When reviewing a jury verdict to determine the *factual sufficiency of the* evidence, the court of appeals must consider and weigh all the evidence, and should set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain,* 709 S.W.2d at 179; *In re King's Estate,* 244 S.W.2d at 661. Determining the credibility of the evidence and the weight to be given thereto is within the sole province of the jurors who had the opportunity to observe the witness' demeanor on the stand. *Hipp v. J.D. Lowrie Well Service, Inc.,* 800 S.W.2d 668, 672 (Tex.App.—Corpus Christi 1990, writ denied); *Garcia v. Dependable Shell Core Machinerys, Inc.,* 783 S.W.2d 246, 247–48 (Tex.App.—Corpus Christi 1989, no writ); *PGP Gas Products, Inc. v. Reserve Equip., Inc.,* 667 S.W.2d 604, 608 (Tex.App.—Austin 1984, writ ref'd n.r.e.). In resolving contradictions and conflicts, jurors may choose to believe all or part or none of the testimony of any one witness in arriving at a finding it concludes was most reasonable under the evidence. *Garcia,* 783 S.W.2d at 247–48.

To elevate negligence to gross negligence, a jury must find that a defen-

12. In addition to added expense, the evidence showed that use of MetroLift vans required

making an appointment twenty-four hours in advance.

dant was consciously or knowingly indifferent to the rights, welfare and safety of the plaintiff. *Burk Royalty Co. v. Walls*, 616 S.W.2d 911, 922 (Tex.1981). A jury must find that a defendant knew about a danger or risk, but that his acts or omissions demonstrated he did not care. *Id.* The test for gross negligence can be an objective or subjective one. *Williams v. Steves Indus., Inc.*, 699 S.W.2d 570, 573 (Tex.1985). A jury may find that the defendant either had actual subjective knowledge of the risk, or that, under the surrounding circumstances, a reasonable person would have realized that his conduct created an extreme risk to the safety of others. *Id.* A jury may infer a defendant's mental state from his conduct. *Burk Royalty*, 616 S.W.2d at 922. We will summarize the evidence pertaining to negligence and gross negligence.

■ As an introduction, it is noteworthy that conflicting evidence may have detracted from the credibility of Miss Lee, who was a crucial witness for Greater Houston. *See Hipp*, 800 S.W.2d at 672; *Garcia*, 783 S.W.2d at 247–48; *PGP Gas Products, Inc.*, 667 S.W.2d at 608. Miss Lee testified that she checked Mr. Zrubeck's "lap tray" and that it was secure, or "locked." However, Mr. Zrubeck demonstrated at trial that he could slide the "lap tray" off his wheelchair; and, he and his nephew testified that the tray had no "lock" and that Mr. Zrubeck had the same wheelchair on the day of the accident. Also, Miss Lee testified that she offered Mr. Zrubeck a seat belt, but he testified that she did not.

Regardless of Miss Lee's testimony, the undisputed evidence showed that Greater Houston had a safety policy which included mandatory seat belt usage. Greater Houston competitively bid for the contract with MetroLift to provide transport services for the elderly and handicapped. In so doing, it assumed responsibility for the safety of passengers who, like Mr. Zrubeck, were more susceptible to injury. The MetroLift handbook was supposed to be the source of its safety guidelines. The handbook stated, "Keep in mind that you are carrying people who are easily injured...." The

undisputed evidence showed that Greater Houston's policy was "no belt, no ride." Pursuant to the handbook, drivers were instructed to call a driver supervisor if a customer refused a seat belt; trainees were to sign for the receipt of the handbook at the conclusion of training; and one violation of the seat belt policy would result in termination.

Conscious indifference on the part of Greater Houston is supported by evidence that Greater Houston's driver training course was inadequate. *Burk Royalty Co.*, 616 S.W.2d at 922; *Williams*, 699 S.W.2d at 573. Miss Lee's supervisor testified that he had experience and special training in the operation of transportation systems for the handicapped and that he knew that approximately 25% of persons with wheelchairs had their own "restraining devices." As discussed above, "restraining devices" are not "safety devices," but are only intended to keep erect an individual who would otherwise not be able to sit up unassisted. Nonetheless, Greater Houston trainees were never instructed with regard to proper seat belt procedures for passengers with their own "restraining devices." From this evidence, the jury could have concluded that Greater Houston consciously disregarded the possibility that 25% of its wheelchair passengers, i.e., the ones who could not sit up unassisted, were likely to go without seat belts. *Id.; Hipp*, 800 S.W.2d at 672; *Garcia*, 783 S.W.2d at 247–48; *PGP Gas Products, Inc.*, 667 S.W.2d at 608.

The record also supports the jury's finding of conscious indifference on the part of Greater Houston in that Greater Houston failed to impress upon its employees the importance of using seat belts. *Burk Royalty Co.*, 616 S.W.2d at 922; *Williams*, 699 S.W.2d at 573. The jury could have concluded that this was evidence of Greater Houston's failure to implement its safety policies. *Hipp*, 800 S.W.2d at 672; *Garcia*, 783 S.W.2d at 247–48; *PGP Gas Products, Inc.*, 667 S.W.2d at 608. Mr. Zrubeck testified that, of the three or four times he had used MetroLift, he was never offered a seat belt. That a seat belt was not used on the day of the incident in question supports

this proposition. Miss Lee testified that she and other drivers permitted wheelchair passengers to ride without seat belts on a regular basis. In the case of Mr. Zrubeck, she allowed his "lap tray" to be used as a seat belt. It is within the province of the jury to disregard or minimize Miss Lee's testimony that she offered a seat belt to passengers with their own restraining devices. From this evidence of failure to use seat belts on the part of Greater Houston's employees, the jury could have inferred that Greater Houston failed to implement its seat belt policy, indicating a conscious disregard of the welfare of 25% of its wheelchair passengers.

The record contains other evidence of Greater Houston's failure to implement its safety policy. Miss Lee and her supervisor were unaware of critically important information in the MetroLift safety handbook. Until she was investigated, Miss Lee did not know that failure to use a seat belt resulted in termination. Neither Miss Lee nor her supervisor knew at the time of their depositions that the handbook required a driver to call the driver supervisor if a client refused a seat belt. Even though her supervisor had copies of the MetroLift handbook in his office, he did not show it to Miss Lee during the investigation, and at trial she was still unaware of the existence of the handbook. From this evidence, the jury could have inferred that Greater Houston failed to adequately impress upon its employees and managers the importance of safety and the use of seat belts.

In the face of the termination policy, Miss Lee's supervisor determined that, "in effect," Mr. Zrubeck was wearing a seat belt. As a result, instead of termination, Miss Lee was eventually promoted to driver supervisor. It was within the province of the jury to conclude that Miss Lee's promotion constituted approval of her conduct on the part of Greater Houston.

Finally, Miss Lee's supervisor testified in his deposition that "this incident is one of the least shocking things of all the incidents that have occurred in our company." During live testimony, he stated that accidents at Greater Houston were quite common and that this incident was not shocking. The jury could have inferred from comments such as these that Greater Houston was consciously indifferent to the welfare of its passengers.

From this evidence, the jury could have found negligence and concluded that the mental attitude of Greater Houston or its employees was one of conscious indifference. *Burk Royalty Co.*, 616 S.W.2d at 922. The jury's findings with regard to negligence and gross negligence are not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain*, 709 S.W.2d at 179; *In re King's Estate*, 244 S.W.2d at 661. Greater Houston's fourth, fifth and sixth points of error are overruled.

By its final point of error, Greater Houston argues that the exemplary damages awarded to Mr. Zrubeck are clearly excessive and against the great weight and preponderance of the evidence. It argues that the amount is the result of passion, prejudice or other improper motive. Furthermore, it claims that Greater Houston did not receive any justice at trial due to the sympathy created by the appearance of Mr. Zrubeck in a wheelchair. Because the $500,000 awarded to Mr. Zrubeck is a reasonable amount, we hold that the exemplary damages are not excessive.

Exemplary damages primarily serve to punish the wrongdoer and to provide an example to other potential wrongdoers. *Corporate Wings, Inc. v. King*, 767 S.W.2d 485, 488 (Tex.App.—Dallas 1989, no writ). Thus, the fairness of the award from the standpoint of the injured party is but a secondary consideration. *Id.* at 489. The determination of the amount of exemplary damages to be awarded should depend upon the facts of a case and remain largely within the sound discretion of the jury. *Voskamp v. Arnoldy*, 749 S.W.2d 113, 121 (Tex.App.—Houston [1st Dist.] 1987, writ denied). On review, two analyses are used: 1) whether the defendant was justly punished under the circumstances of the case, and 2) whether the exemplary damages are reasonably propor-

tional to the actual damages. *Alamo Nat'l Bank v. Kraus,* 616 S.W.2d 908, 910 (Tex. 1981); *First Sec. Bank & Trust Co. v. Roach,* 493 S.W.2d 612, 619 (Tex.Civ. App.—Dallas 1973, writ ref'd n.r.e.); *Underwriters Life Ins. Co. v. Cobb,* 746 S.W.2d 810, 817–18 (Tex.App.—Corpus Christi 1988, no writ). To determine reasonableness, most courts consider five factors enunciated in *Alamo Nat'l Bank v. Kraus:* 1) the nature of the wrong, 2) the character of the conduct involved, 3) the degree of the wrongdoer's culpabilities, 4) the situation and sensibilities of the parties, and 5) the extent to which the defendant's conduct offends the public's sense of justice and propriety. *Kraus,* 616 S.W.2d at 910; *Cobb,* 746 S.W.2d at 817–18. However, we should not substitute our judgment for that of the jury unless we see a clear showing of passion, bias or prejudice, or the review of the evidence leads to a conclusion that shocks the conscience of the court.

■ We find that the exemplary damages awarded by the jury are reasonably proportional to the actual damages. The jury awarded Mr. Zrubeck actual damages in the amount of $175,000 and exemplary damages in the amount of $500,000. Thus, the proportion is less than three-to-one. This court has held that a ratio of three-to-one is not unreasonable.[13] *Delta Drilling Co. v. Cruz,* 707 S.W.2d 660, 667 (Tex. App.—Corpus Christi 1986, writ ref'd n.r.e.). Even if the ratio were not a mere three-to-one, applying the five *"Kraus* factors" mentioned above, we would reach the same conclusion. Greater Houston competitively bid to acquire the right to safely transport the elderly, physically handicapped and mentally retarded in MetroLift vans. When a company takes on such a great responsibility, it is a reasonable assumption that the public expects it to exercise extra care. Instead, while providing a public service to a potentially vulnerable and fragile clientele, Greater Houston

failed to impress upon its drivers the importance of safety belt usage.

We also find that Greater Houston is justly punished by this award. Greater Houston is a subsidiary of Yellow Cab Service Corporation, which has a net worth such that the trial was bifurcated to avoid possible prejudice in determining gross negligence. From the perspective of Greater Houston, an award of $500,000 in exemplary damages is not excessive.

The Supreme Court of Texas in *Hofer v. Lavender,* thoroughly discusses the purposes of exemplary damages, and recognizes that there are implied purposes of exemplary damages, more subtle than punishment and deterrence. *Hofer v. Lavender,* 679 S.W.2d 470, 474–75 (Tex.1984). In *Hofer,* the Court was faced with the issue of whether, under the Texas Survival Statute, there existed a right to collect exemplary damages from the estate of a deceased tortfeasor. *Id.* at 474. Concluding that such a right does exist, the Court cited numerous purposes of exemplary damages in addition to punishment. The *"Hofer* components" of exemplary damages include 1) reimbursement for losses too remote to be considered as elements of strict compensation, 2) compensation for inconvenience and 3) attorney's fees. *Id.* at 474–75 (citing *Mayer v. Duke,* 72 Tex. 445, 10 S.W. 565 (1889) and *Allison v. Simmons,* 306 S.W.2d 206 (Tex.Civ.App.—Waco 1957, writ ref'd n.r.e.)); *Celotex,* 797 S.W.2d at 209. The Supreme Court of Texas treated the *Hofer* components as implicit motivations by the jury to award exemplary damages. Thus, we will examine the applicability of the *Hofer* components to the instant case.[14]

Breaking the legs of a man who has no feeling below his sternum is certainly an unusual form of damages to be included in strict compensation. Yet, not to acknowledge such a grievous injury would be to fly in the face of the societal function of the tort compensation system. Otherwise, we would not compensate a blind man for the

---

13. Although it was not raised by appellant, this amount is within the punitive damages limit provided in Tex.Civ.Prac.Rem.Code Ann. § 41.007 (Vernon Supp.1993).

14. It is noteworthy that the additional *Hofer* components could easily fall within the "situation and sensibilities of the parties" factor enunciated in *Alamo Nat'l Bank v. Kraus, supra.*

loss of an eye. The jury may have believed that the elements of actual damages listed in the charge were insufficient to adequately compensate Mr. Zrubeck. Because of the unusual facts of this case, it is wholly possible that the exemplary damages award included a component of "compensation for losses too remote to be considered as elements of strict compensation." *Hofer*, 679 S.W.2d at 474. "Inconvenience" also may have played a role in the jury's award of exemplary damages. It is, of course, difficult for Mr. Zrubeck to travel. The evidence showed that the likelihood of further complications of Mr. Zrubeck's injuries increases the more he is moved. He also has to ride on MetroLift vans. Clearly, under any applicable standard of review of the reasonableness of punitive damages, the jury's award of $500,000 can not be said to be excessive.

Having reviewed the evidence, we do not find that the award of exemplary damages was a result of passion, bias or prejudice. *Armellini Express Lines v. Ansley,* 605 S.W.2d 297, 313 (Tex.Civ.App.—Corpus Christi 1980, writ ref'd n.r.e.). It does not lead us to a conclusion that shocks the conscience. *Id.* Thus, we will not order a remittitur, and the award of exemplary damages stands. *Id.* Greater Houston's seventh point of error is overruled.

Appellant's seven points of error are overruled. The trial court's judgment is AFFIRMED.