**CAL–TEX LUMBER COMPANY, INC., Appellant,**

v.

**OWENS HANDLE COMPANY, INC., Appellee.**

No. 12–97–00129–CV.

Court of Appeals of Texas, Tyler.

Feb. 25, 1999.

Mike Hatchell, Tyler, Clayton E. Dark, Jr., Lufkin, for appellant.

Tom D. Rorie, Nacogdoches, for appellee.

Panel consisted of RAMEY, Jr., C.J., HADDEN, J., and WORTHEN, J.

RAMEY, Justice.

Owens Handle Company, Inc. ("Owens Co.") sued Cal–Tex Lumber Company, Inc. ("Cal–Tex") for breach of contract and violation of the Texas Deceptive Trade Practices Act ("DTPA"). The jury awarded Owens Co. $1,299,445 in damages on the breach of contract action, and $1,299,445 in actual damages plus $50,000 in exemplary damages on the DTPA cause of action. Owens Company subsequently elected to recover under breach of contract. Cal–Tex appeals raising six points of error. We will reverse and remand for a new trial.

## I. FACTUAL BACKGROUND

The factual background underlying this suit spans nearly seven years. In 1987, George Schmidbauer, a California businessman, delegated to Barry Ogletree the job of constructing and managing Cal–Tex Lumber Company, Inc. ("Cal–Tex") a state of the art, high volume, sawmill in Nacogdoches, Texas. The mill was to use lumber milling procedures that Schmidbauer had perfected in California. Thereafter, in the summer of 1987, during Cal–Tex's construction, Ogletree contacted Bill Owens, President of Owens Handle Company, Inc. ("Owens Co."), an established handle manufacturing company located in Conroe, Texas. Ogletree inquired as to whether Owens's business would be interested in installing a broom handle operation in one end of Cal–Tex's newly designed mill.[1] Since Ogletree and Owens had both grown up in families active in the East Texas lumber industry, the two had been acquain-

---

1. In a number of other mills, Owens had established an operation whereby it retrieved edging strips produced from the sawmill, then cut them to length, plane them and run them through a gang saw to turn the strips into squares. These squares were then be transported to Owens Co.'s site in Conroe where they were turned into dowels, which were ultimately made into handles of varying sizes.

ted since the 1950's. Owens expressed enthusiastic interest in the proposal, and plans for the project quickly developed.

In contemplation of this union, Ogletree, with Schmidbauer's approval, built an additional bay at Cal–Tex to house Owens Co.'s broom handle recovery operation. The two companies thereafter worked together, and with the aid of Kelsie Roach, the engineer who had designed the Cal–Tex facility, they created what they asserted was an efficient, innovative layout for installing Owens Co.'s operation on the mill or mezzanine floor of Cal–Tex's facility. Thereafter, in September of 1988, with Schmidbauer's knowledge and approval, Owens Co. and Cal–Tex memorialized their basic obligations to one another in a succinct Production Contract.[2] The parties also executed a separate Pricing Agreement at that time. Following execution of the contracts, Owens located an expensive, specially manufactured gang saw (the "Producto saw") to be installed and used by Owens in its operations at Cal–Tex. Prior to purchasing the saw, however, Owens provided Ogletree with a sample of the Producto saw's wood chips. Ogletree thereafter approved the chips and gave Owens Co. his approval to make the purchase. Owens testified that prior approval was sought since Ogletree had emphasized Schmidbauer's interest in achieving the maximum utility of all wood byproducts including wood chips, which if properly sized, could be sold to paper companies.

A few months later, in February of 1989, Cal–Tex terminated Ogletree's employment with the company. Owens Co. thereafter dealt with Schmidbauer and his son-in-law, Art Patterson, who was Cal–Tex's comptroller, and at some point, its part owner. Despite the fact that Ogletree had previously approved the Producto saw's wood chips and had advocated installation of Owens Co.'s operation on the mill floor with Schmidbauer's knowledge, Schmidbauer was critical of both the Producto saw's wood chips and Owens Co.'s plans for installing its equipment on the mill floor.

In March of 1989, Owens arranged another meeting with Schmidbauer to coincide with his trip to Texas. Although Owens and Roach traveled to Cal–Tex on the appointed day, Schmidbauer refused to see them. Ten days later, on March 27, 1989, Owens wrote to Schmidbauer in California and detailed the history of his dealings with Cal–Tex. He explained the numerous trips he had made to Cal–Tex for discussions with Ogletree, the sketches, blueprints and layouts of the Cal–Tex bay area which had been designated for his square recovery equipment, and his conversations with Ogletree during which Ogletree had explained to Owens his plans for placing Owens Co.'s equipment on the mill floor. Owens then explained that based upon these representations from Ogletree, he had incurred significant expenses for engineering services and specially designed equipment and that he was committed to further financial outlay to perform under the contract. Owens then asked Schmidbauer to carefully consider the situation and examine Cal–Tex's position regarding preparation of the work area at Cal–Tex.

On March 31, 1989, without addressing the concerns in Owens' letter, Schmidbauer wrote to Owens setting forth a different scheme for removal of usable wood from the edging conveyor which placed the operation on the ground floor. At the close of Schmidbauer's letter, he stated that Cal–Tex could design the proposal for Owens Co., so Roach would not need to be consulted. Enclosed with his letter was a sketch of his proposed edging strip removal scheme. Two weeks later, Owens responded to Schmidbauer's letter expressing his concerns about safety aspects of the new ground floor. Owens additionally stated that he would have to employ three additional people to operate it in the way Schmidbauer suggested. He, nevertheless, made an alternate proposal for a ground floor retrieval method, but requested that Schmidbauer reconsider placing the operation on the mill, rather than ground, floor. Owens closed by stating that he was eager to get a plan "hammered out" so production could begin "ASAP."

On April 27, 1989, Art Patterson wrote Owens stating that they had thought the

2. Art Patterson, Cal–Tex's secretary-treasurer, signed on behalf of Cal–Tex, and Bill Owens, Owens Co.'s President, signed on behalf of Owens Co.

1988 Production Contract contained the parties' entire agreement, but apparently that was not Owens' understanding. He then requested that Owens send them a letter that detailed "the entire agreement at this point between Cal–Tex Lumber Company, Inc. and Owens Handle Company, Inc. as you understand it." Patterson further requested that Owens include "any oral agreements Barry Ogletree may have made with you," any dollar value limits on expenditures that were discussed, and specific equipment, manpower, and raw materials that were to be provided by Cal–Tex. Patterson then stated: "Please understand that it is very difficult for us to keep commitments to you if we have no knowledge of them." He then closed by stating that Cal–Tex looked forward to a "clearer understanding of our business relationship."

On May 2, 1989, in an attempt to reconstruct the parties' agreement, Owens wrote Patterson and provided what he described as a brief synopsis of events that transpired over an eighteen-month period. Owens stated that he was instructed to come up with a layout and equipment selection that would: (1) be placed on the mill floor to facilitate close supervision; (2) would use thin kerf saws to maximize chips; and (3) require the minimum amount of labor. He then explained that he was specifically instructed to plan for equipment on the mill floor because of the way Ogletree told him the equipment would set up. Owens also described in some detail why he had been instructed to place the equipment on the mill floor. As for money matters, Owens stated that no discussions had taken place about the amount of money budgeted for the square production operations, but he did state that he was told that "an extra bay of the Cal–Tex sawmill building was being constructed to house this operation." Owens further stated that at one time he was shown a transformer and motor control center and told that it was for his operation. He further stated:

> During the entire period, I worked under the understanding that I would design the layout, and purchase and provide the equipment necessary to cut, rip, and convey the material. Cal–Tex would provide the building bay, upper floor, electrical and

labor. The responsibility for labor was changed in the fall of 1988.

Following this letter, Schmidbauer expressed concerns regarding the lack of indemnity and insurance provisions in the Production Contract, and the parties discussed modifying the contract. Owens stated that he had the original contract on his computer and would be glad to add provisions for insurance, indemnity and a purchase option. In connection therewith, Cal–Tex forwarded their requested provisions. Owens incorporated those provisions, made a few minor changes of his own, and in July of 1989, Owens forwarded to Leon Ray a proposed new production contract. In his cover letter, he stated that he had not had Roach develop another blueprint pending a basic acceptance of the enclosed agreement. He, however, stated that he was ready to proceed with that once they had their questions and concerns resolved.

In August of 1989, Cal–Tex executed two signed copies of the newly proposed agreement. Owens Co., however, did not execute the agreement until February of 1990. The newly executed contract contained thirteen provisions instead of the original ten, and it adopted the 1988 Pricing Agreement previously agreed to by the parties.

Following execution of the 1990 Contract, on April 24, 1990, Owens wrote to Ray and Patterson and provided them with a list of equipment and the respective horsepower for each item that he had purchased "based upon three cut lines and the ripsaw located at mill floor elevation." He further stated that if the decision was made to put it on the ground floor, he would probably require additional conveyors, both descending and elevating. Owens testified that this list had been requested so that Cal–Tex could acquire the proper size motor controls for the electric motors that would be necessary to make the machinery run.

According to Owens, at the time the 1990 contract was signed, all he needed in order to commence operations was a place to put his equipment. At the time they executed the contract, Owens stated that they could have operated the square recovery facility within

ninety days. He stated that the matters preventing Owens Co. from operating at Cal–Tex were: (1) no platforms on which to put the equipment on the mill floor; and (2) no accepted plans to put it on the ground floor. He stated that although he had many conversations with Ray and Patterson and presented twelve to fifteen different proposals and about twenty different machinery layouts from his engineer, Cal–Tex never accepted any of them. Owens stated that the complaints usually pertained to wood chip quality, sawdust or the width of edging strips that Owens Co.'s equipment would accommodate [3], but they never offered any suggestions about ways to make them work.

Owens further stated that when it became apparent that Cal–Tex would not allow installation of equipment on the mill floor, he had eight to ten different discussions with Patterson and presented more than a dozen different proposals for installation on the ground floor. During the latter half of 1990, Owens visited a number of plants and looked at horizontal ban saws and other types of equipment that might be substituted for the Producto saw. Owens made numerous trips to the Cal–Tex mill. According to Owens, every conceivable possibility for installation on the ground floor was presented by him and rejected by Cal–Tex. These rejections were described as being in the nature of "critiques" rather than suggestions. Cal–Tex, however, never presented a single full layout as to what they desired.

At about the same time Owens was presenting various proposals for installation of the equipment on the ground floor, Patterson informed Owens that Cal–Tex planned to install a mini-sawmill ("mini-mill") underneath the existing sawmill for the purpose of processing smaller logs into lumber. Patterson told Owens that Owens would probably want to wait and see what impact the mini-mill was going to have on the squares recovery operation. Owens stated that this was a concern to him because, by this time, it had appeared that Schmidbauer was not going to

approve installation of Owens Co.'s equipment on the mill floor. The presence of the mini-mill on the ground floor made it impossible to gather material from one of the three conveyor troughs and made it much more difficult to gather materials from the second trough. Consequently, its installation was going to cut off at least one-third of the materials directed to the square recovery operation if placed on the ground floor. When Cal–Tex made reference to the mini-mill, its representatives were vague about the exact place of its installation. In fact, Owens Co. was neither consulted nor informed about the location of the mini-mill. During 1990 and 1991, Owens estimated that he traveled to Cal–Tex to see what could be done on seven or eight occasions. On one of his trips to Cal–Tex, Owens unexpectedly observed that the mini-mill had been installed and was operating. After installation of the mini-mill Owens placed the project on hold for much of 1991.

As the project grew older and no significant progress was made toward the commencement of operations, from time to time, Owens Co. had to delay its efforts to obtain Cal–Tex's approval due to the press of other business. In January of 1992, following one of these lulls in negotiations, Cal–Tex's attorney wrote Owens Co. a letter criticizing the viability of the parties' 1990 contract and suggesting that due to market changes and other concerns, Cal–Tex was going to abandon the contract unless prompt and serious efforts were made to reassess the feasibility of the arrangement and to commence operations.

Owens Co. responded immediately, and the parties and their attorneys promptly met. At that meeting, Patterson informed Owens that due to changes in milling, Cal–Tex might not be producing enough edging strips to make the operation profitable for the parties. In response, Owens suggested that his company conduct a sample test to assess the mill's routine output. With the

3. Ogletree had previously approved Owens Co.'s purchase of a Producto saw that would accommodate an edging strip as much as six-inches in width. Ogletree testified that he had informed Owens that if a strip was wider than that, it should have been turned into lumber. Owens further stated that Ogletree had assured him that any edging strips wider than that could easily be run through Cal–Tex's rip saw before it was sent to Owens Co.'s Producto saw.

cooperation of both parties, Owens Co. temporarily installed a conveyor, cutter and other necessary equipment. On October 5, 1992, it conducted a test run wherein it retrieved approximately sixty-five to seventy-five percent of available edging strips from one of three conveyors.[4] After processing and examining the data from the test run, Owens expressed his encouragement about the operation stating that Cal–Tex had quite a large output of edging strips. Cal–Tex did not charge Owens Co. for the edging strips it retrieved during the test. Patterson, however, later informed Owens that he had concerns that the test results might not be accurate. Owens thus suggested that they be allowed to retrieve a second sample, their equipment having been left at Cal–Tex after retrieving the first test sample. The evidence, however, is disputed as to which party precluded the taking of a second sample.

Finally, in late 1992 and early 1993, the parties exchanged letters both alleging that they had acted in good faith and questioning the other's willingness to perform. Owens Co. then made a variety of alternative proposals for retrieving the edging strips, which it felt might allay Cal–Tex's concerns about wood chips and sawdust. For instance, Owens Co. suggested that it be allowed to cut rectangles instead of squares. This would simplify the operation by discarding Owens Co.'s Producto saw from the process, and leaving the edging strips' thickness "as is" as they came out of Cal–Tex's edger, rip it to width and then make squares at Owens Co.'s plant in Conroe. This plan, however, was rejected because Cal–Tex objected to the saw dust that the saws made.

On February 8, 1993, Owens then faxed Patterson a proposed layout sketch for the ground floor utilizing two ripsaws, neither of which was the Producto saw that had been specially purchased for the project. Those proposals, however, were likewise rejected.

Thereafter, in March of 1993, further negotiations were delayed due to Cal–Tex's initiation of new wood cutting techniques. During this time, however, Owens continued to communicate with Patterson. Also during this time, Owens was also awaiting a new contract that Patterson had mentioned in January of 1993, since Patterson had stated that nothing was going to happen at Cal–Tex until they refined the contract.

Cal–Tex eventually tendered a new contract which was not a clarification of the parties' former contract, but constituted a detailed contract containing numerous terms which Owens deemed shocking and onerous. Following receipt of this new contract, Owens initiated a series of meetings seeking to reach a workable middle ground. Despite these attempts, however, the parties could reach no agreement. Ultimately, after Cal–Tex rejected Owens Co.'s final proposal of March 2, 1994, which entailed allowing Owens Co. to cut the edging strips to length on Cal–Tex's premises so Owens Co. could haul the wood to a nearby location purchased by it for planing and processing, Owens Co. ceased negotiations and filed the underlying action.

Following a jury trial, verdict was rendered in favor of Owens Co. for $1,299,445.00 on its breach of contract claim. Cal–Tex has appealed challenging the jury's finding of breach, and its assessment of damages.

## II. COMPLAINTS REGARDING THE BREACH OF CONTRACT FINDING

Under point one, Cal–Tex presents three separate arguments in support of its position that it did not breach the contract "during the period it could have been breached." Although this is a multifarious point, we will attempt to address each properly preserved and argued contention in turn. TEX.R.APP. P. 52(a), 74(p).[5]

---

4. At some point, this conveyor was temporarily closed during which time, Owens Co. retrieved strips from one of the other conveyors.

5. The briefs in this case were filed prior to September 1, 1997. Accordingly, we have applied the Texas Rules of Appellate Procedure, effective September 1, 1986, as amended through February 1997. Those rules, however, have since been

revised and replaced effective September 1, 1997, by Order of the Texas Supreme Court. 60 TEX. B.J. 876 (1997). All citations to the appellate rules, however, shall be to the Rules of Appellate Procedure in effect at the time these briefs were filed unless otherwise specified.

## A. WHETHER OWENS CO. FAILED TO COMPLY WITH A CONDITION PRECEDENT

First, Cal–Tex argues that it had no duty to perform under the 1990 Production Contract because Owens Co. failed to establish that it satisfied a material condition precedent to Cal–Tex's performance. This complaint was preserved by motion for new trial. In support of its position, Cal–Tex cites two federal cases from other jurisdictions. Those authorities are neither binding nor persuasive.

 "A condition precedent is an event that must happen or be performed before a right can accrue to enforce an obligation." *Centex Corp. v. Dalton,* 840 S.W.2d 952, 956 (Tex.1992); *Hohenberg Bros. Co. v. George E. Gibbons & Co.,* 537 S.W.2d 1, 3 (Tex.1976). A party seeking to recover under a contract bears the burden of proving that all conditions precedent have been satisfied. *Associated Indemnity Corp. v. CAT Contracting, Inc.,* 964 S.W.2d 276, 283 (Tex.1998). In order to determine whether a condition precedent exists, we must ascertain the intention of the parties by examining the entire contract. *Criswell v. European Crossroads S. Ctr.,* 792 S.W.2d 945, 948 (Tex.1990). Such terms as "if," "provided that," "on condition that" or some similar phrase of conditional language are normally required to create a condition precedent. *Id.* While there is no requirement that such phrases be utilized, their absence is probative of the parties' intention that a promise be made, rather than a condition imposed. *Id.*; *Hohenberg,* 537 S.W.2d at 3. Moreover, because of their harshness in operation, conditions precedent are not favored in law. *Criswell,* 792 S.W.2d at 948. Courts will not construe a contract provision as a condition precedent unless they are compelled to do so by language that may be construed in no other way. *Reilly v. Rangers Management, Inc.,* 727 S.W.2d 527, 530 (Tex.1987). However, where a contract does contain a condition precedent, it must either have been met or excused before the other party's obligation can be enforced. *Shaw v. Kennedy, Ltd.,* 879 S.W.2d 240, 246 (Tex.App.—Amarillo 1994, no writ).

 The contractual provision which Cal–Tex alleges is a condition precedent is set forth in paragraph 10 of the 1990 Production Contract and provides:

**During the terms [sic] of this Agreement and any extensions thereto,** Buyer [Owens Co.] covenants and agrees to maintain the following insurance coverage and limits of liability:

(a) Comprehensive Vehicle Liability Insurance, including owned, hired, and non-owned vehicle coverage with limits of not less than $100,000/$300,000 bodily injury liability and $100,000 property damage liability each occurrence or $300,000 combined single limit bodily injury and property damage each occurrence;

(b) Comprehensive General Liability Insurance, including contractual coverage with limits of not less than $500,000 bodily injury liability and $250,000 property damage liability each occurrence or $500,000 combined single limit bodily injury and property damage each occurrence;

(c) Worker's Compensation and Employer's Liability Insurance in statutory amounts, fully covering Buyer's operation hereunder, including coverage for all members of Buyer's organization, whether employer, sole proprietor, partner, office, and all employees.

Certificates of insurance evidencing such coverage shall be provided to Seller **prior to the commencement of any operations hereunder,** and each certificate of insurance shall contain a provision for direct notification to Seller no later than ten (10) days prior to any cancellation of effective amendment to that policy's coverage of limits. In the event of any such cancellation or material change in insurance coverage, Seller may immediately terminate this Contract without further action. (emphasis added).

Applying the above principles of law to the contract provision at issue, we hold that Owens Co.'s duty to procure and provide proof of insurance was a condition precedent to production of squares under the contract, but was not a condition precedent to Cal–Tex's duty to provide flooring or substructure and

electrical switch gear under the contract. Under paragraph 1 of the contract, the parties agreed that the contract was one for the *production* of pine squares at Cal–Tex Lumber Company. Before operations for the production of pine squares could commence, however, the parties had certain obligations under the contract with regard to preparing the site and providing equipment. For instance the contract stated that Cal–Tex would:

(1) provide adequate covered working space for the production of squares, including "necessary flooring or substructure;" and

(2) provide electricity as required at no cost to Owens and provide "main electrical switchgear (motor control center), as needed" for Owens Co.'s machinery;

In turn, Owens Co. would:

(1) provide all equipment necessary to produce squares from waste strips provided by Cal–Tex;

(2) provide all necessary labor for the production, inspection, and loading of squares, and to assume all labor costs both direct and indirect;

Then, in paragraph 10, Owens Co. agreed to provide proof of insurance coverage prior to commencement of operations under the Production Contract.

Since Owens Co. alleged that Cal–Tex breached the contract by its failure to prepare the work site, and, according to the contract, Owens Co.'s obligation to provide insurance was not a condition precedent to preparation of the work site, the obligation to carry insurance and provide proof thereof, had not yet accrued at the time of the alleged breach. Thus, paragraph 10 was not a condition precedent to Cal–Tex's duty to provide flooring and switch gear.

Evidence adduced at trial regarding the commencement date and the provision of the insurance under the contract also support this reading of the contract. On cross-examination, Owens agreed with Cal–Tex's attorney that the parties' 1990 Production Contract did not specify a commencement date for the five-year term. He, however, stated that the Pricing Agreement did have a commencement date, that being upon the first shipment of squares. According to Owens, a commencement date was not included in the Production Contract because the Production Contract and Pricing Agreement were dependent upon one another. Thereafter, while being cross-examined about insurance, Owens testified as follows regarding insurance coverage:

Q. Okay. Have you provided certificates of insurance as required by the contract?

A. As I said, I faxed my insurance agent about that. I do not know if he did it or not.

Q. Okay. Contract says that you're going to provide the certificates of insurance to Cal–Tex?

A. Yes, sir. That takes a phone call generally when you're ready to do it.

Additionally, when Patterson, Cal–Tex's comptroller, was questioned about insurance coverage under the Production Contract, he testified that when they negotiated the 1990 contract, he asked Owens Co. to carry insurance, and Owens agreed. He did not recall discussing whether Owens Co. already had insurance. He, however, stated that he did not remember that there was any marked problem with the insurance aspects of the contract.

After examining the entire contract in light of the legal precepts stated above and the evidence presented at trial thereon, we hold that paragraph 10 was not a condition precedent to Cal–Tex's duty to supply flooring or substructure and electrical switch gear. Thus, Owens Co. had not yet been required to perform its obligations under paragraph 10 at the time Cal–Tex breached the contract. Accordingly, Cal–Tex's first argument under point one is overruled.

**B. No Evidence of Breach of Contract**

Cal–Tex also argues under point one that for three specific reasons, Owens Co.'s failure to perform/offer performance [6],

---

**6.** Cal–Tex. argues that Owens Co.'s cannot recover for breach of contract without proving that it

performed, or alternatively, offered to perform the obligations of the contract with the ability to

waiver, and estoppel [7], there was no evidence to support the jury's finding that Cal–Tex breached the contract with Owens Co. Former Rule 52(a) of the Texas Rules of Appellate Procedure, in effect at the time this case was tried, provides:

> In order to preserve a complaint for appellate review, a party must have presented to the trial court a timely request, objection or motion, stating the specific grounds for the ruling he desired the court to make if the specific grounds were not apparent from the context.

Complaints of no evidence and legal insufficiency are properly preserved at each of the following stages: (1) objection to the submission of a pertinent jury question; (2) motion for directed verdict; (3) motion to disregard answers to jury questions; and (4) motion for judgment non obstante verdicto. *Cecil v. Smith*, 804 S.W.2d 509, 510–511(Tex.1991). While these complaints may also be preserved by motion for new trial, in the event of a reversal, the movant will only be entitled to a remand for a new trial. *Werner v. Colwell*, 909 S.W.2d 866, 870 n. 1 (Tex.1995) (op. on reh'g). In the instant case, of the three legal sufficiency complaints raised above, only the waiver issue was preserved for review.[8] TEX.R.APP. P. 52(a). Accordingly, our review is limited to that issue.

 Cal–Tex argues that there is no evidence to support a finding of breach of contract because Owens Co. waived all breaches prior to December 22, 1992 when it insisted on Cal–Tex's performance in its letter dated December 22, 1992. The jury was instructed as follows on the issue of "waiver" in relation to breach of contract: "A party is excused from performing the contract when the ... other party commits acts or omissions constituting a waiver...."

Cal–Tex asserts that the italicized statement contained in Owens's letter of December 22, 1992 to Patterson, which is set forth below, constituted a waiver of contract breaches prior to that date. In so arguing, Cal–Tex merely extracts excerpts from the letter without considering them in context.

On December 22, 1992, Owens wrote Patterson at Cal–Tex and stated that the last time they spoke was just after they had completed their sample test at Cal–Tex. As requested, Owens had come up with some suggestions as to an alternative way of getting Cal–Tex's material out of the trough. He, however, stated, "there has been a nagging concern in my mind regarding equipment Owens Handle Company has already purchased." He then stated:

> This entire endeavor has been an unusual one, plagued by delays, communication faults and far too much preoccupation with other projects. For my part, I feel that Owens Handle Company has acted in good faith. We worked with you from the beginning to come up with a workable layout to make squares, at your request. We did extensive engineering to assure that our project would fit in with your lumber operations. We pursued more modern equipment to do the job, and after Cal–Tex approval, purchased this equipment and conveyors.
>
> At this juncture, I still feel that producing squares at the Cal–Tex sawmill makes

---

do so. Implicit within this argument is Cal–Tex's assertion that there is no evidence to establish that Owens Co. satisfied the requirement of establishing its performance or offer to perform. This issue, however, was neither submitted to the jury nor provided in the court's definition of breach of contract.

7. Cal–Tex alleges that Owens Co. was estopped by its actions beginning in January of 1993, from recovery of any alleged breach which incurred after 1992 since it led Cal–Tex to believe it was working toward a new agreement. As this is also an affirmative defense under TEX.R. CIV. P. 94, Cal–Tex had the burden of proof on this issue. Cal–Tex neither requested an instruction nor lodged an objection to the omission of this affirmative defense, and no reference was made to estoppel in the motion for judgment NOV or motion for new trial.

8. Although Cal–Tex asserted a "no evidence" claim in its motion for JNOV and motion for new trial, its basis was that there was no evidence to support the jury's finding of breach because the evidence established that Cal–Tex had satisfied the contractual obligations at issue. It did not, however, assert any of these three complaints as a bar to the jury's finding of breach of contract. Because, however, the issue of waiver was presented to the jury and Cal–Tex did object to the trial court's failure to separately define waiver, we will address Cal–Tex's waiver argument.

sense for both parties; Owens Handle Company gets the wood it needs for its products, and Cal–Tex gets a premium over chip value for this wood. I realize that you have objection to the sawdust our operation would make. Frankly, it is impossible to do any type of sawing without making some sawdust. Your intent, with which I agree, is to make as little of it as possible. That is why I had the special ripping machine built. I feel that I can come up [sic] some ways to cut the pieces efficiently, and minimize the sawdust, but before doing this, I think there are some matters that should be resolved.

*First, will Cal–Tex act in good faith, to see this project through?*

Second, what does Cal–Tex propose to do about the money that Owens Handle Company has expended to date on this project; bearing in mind these expenses were made to comply with directions from Cal–Tex Lumber Company?

Art, *I earnestly hope that we can get this project moving, but I know it will only work if we both want it to work. [sic] need your written response by February 1, 1993.* If you need any data or information, please let me know.

 Since waiver is an affirmative defense, Cal–Tex must have specifically pleaded and proved it in order to be entitled to recover. TEX.R. CIV. P. 94; *Alford Meroney & Co. v. Rowe,* 619 S.W.2d 210, 213 (Tex.Civ. App.—Amarillo 1991, writ ref'd n.r.e). Waiver is an intentional relinquishment of a known right and is either expressly made, indicated by conduct that is inconsistent with an intent to claim the right. *United State Fidelity & G. Co. v. Bimco Iron & M. Corp.,* 464 S.W.2d 353, 357 (Tex.1971); *Smith–Hamm v. Equipment Connection,* 946 S.W.2d 458, 462 (Tex.App.—Houston [14th Dist.] 1997, no writ). The acceptance of late performance, however, is not a waiver of breach as a matter of law. *Commercial Credit Corp. v. Taylor,* 448 S.W.2d 190, 195 (Tex.Civ.App.—Tyler 1969, no writ). Furthermore, a party's continuing performance

after another party's breach is not a waiver of the right to recover damages due to the breach, and a non-breaching party's honest efforts to induce the party in default to perform the contract do not constitute waiver. *Consolidated Engineering Co. v. Southern Steel Co.,* 699 S.W.2d 188 (Tex.1985); *Taylor,* 448 S.W.2d at 195. A party's intention is a primary factor in determining questions of waiver, and in the absence of a clear intent expressed in words, acts, or conduct, waiver will be implied only to prevent fraud or inequitable consequences. *Stowers v. Harper,* 376 S.W.2d 34, 40 (Tex.Civ.App.—Tyler 1964, ref. n.r.e.). In support of its waiver argument, Cal–Tex cites *Delgado v. Methodist Hospital,* 936 S.W.2d 479, 485 (Tex.App.— Houston [14th Dist.] 1996, no writ) and *Seismic & Digital Concepts, Inc.,* 590 S.W.2d 718, 720 (Tex.Civ.App.—Houston [1st Dist.] 1979, no writ).[9] Although Cal–Tex has not attempted to apply these cases to the facts here, we have examined them and concluded that they are distinguishable from the instant case. Notably, in both cases suit for breach of contract was sought after the complaining party had already received performance under the contract.

The facts in the instant case are more akin to those cited in *Consolidated Engineering,* 699 S.W.2d 188. In that case, Southern, a manufacturer of jail facilities, contracted in Texas with Consolidated, a business that erected steel materials and equipment, to erect and construct detention equipment in several states using materials supplied by Southern. Southern agreed to ship the prefabricated parts to Consolidated's job site in a timely and orderly manner. After the parties began performance, a contract dispute arose concerning Southern's delays in shipping needed materials, and Consolidated's consequent delays in installation. Consolidated expressed its dissatisfaction in a letter dated January 19, 1979, stating that although it considered Southern in breach of their agreement, Consolidated "would prefer to reach some agreement with you that will result in completion of the CENTER as soon

---

**9.** In violation of TEX.R.APP. P. 74(f), Cal–Tex has failed to present argument applying these authorities to the case at bar. However, since it has at least made reference to the specific portion of the record to which it complains, we will attempt to address the point.

as possible." The parties' representatives thereafter met several times, and in February, Southern expressed in writing its desire to continue without waiving rights under the contract. Consolidated thereafter stayed on the job for the next three months before quitting in June of 1979. After Southern sued Consolidated for breach of contract, Consolidated counter-sued alleging that Southern had failed to perform by not delivering the component parts in sequence. Consolidated prevailed at trial, but on appeal, the court reversed holding that Consolidated had waived the breach asserted in its letter of January 19, 1979, by staying on the job, and had thus affirmed the contract. In reversing the court of appeals' decision, the supreme court stated that there was no intention to waive prior breaches under the contract, and that it could not in equity hold that Consolidated should be prevented from asserting its legal rights simply because it had given Southern another opportunity to comply with the subcontract. *Consolidated*, 699 S.W.2d at 191.

In the instant case, nothing in the record indicates Owens Co.'s desire to relinquish its claim of past breaches by Cal–Tex. As in *Consolidated*, Owens's letter of December 22, 1992, expressed his company's concerns about delays. Additionally, he reminded Cal–Tex of how much good-faith, time and money Owens Co. has already expended on the contract. Moreover, the question Owens asked of Patterson, "[W]hat does Cal–Tex propose to do about the money that Owens Handle Company has expended to date on this project; bearing in mind these expenses were made to comply with directions from Cal–Tex Lumber Company?", appears intended as a forewarning to Cal–Tex that in the event they did not move forward with the contract, Owens Co. was not going to walk away without remuneration for its expenditures. The statements which Cal–Tex asserts constitute a waiver, when viewed in context, represent only a good faith effort to get Cal–Tex to perform. *Id.* There having been no evidence of Owens Co.'s intent to abandon prior breaches, we hold that Cal–Tex failed to establish its affirmative defense of waiver.

Moreover, in addition to the absence of waiver of breaches prior to December 22, 1992, the evidence establishes that Cal–Tex breached the contract after that date. In response to the letter at issue, Patterson wrote Owens in January of 1993, and stated that nothing more was going to happen until they refined the contract. At this point, Owens concluded that Cal–Tex was not going to approve any of Owens Co.'s plans for installation of its equipment on the ground floor, so Owens presented another series of proposals which would eliminate usage of some of the equipment for which Cal–Tex had refused to approve installation. First, Owens Co. offered to simplify the operation by discarding Owens Co.'s Producto saw from the process, and leaving the edging strips' thickness "as is" as they came out of Cal–Tex's edger, rip it to width on the premises, then make squares at Owens Co.'s plant in Conroe. This plan, however, was rejected because Cal–Tex did not want the saw dust that the saws made. Second, on February 8, 1993, Owens faxed Patterson a proposed layout sketch for ground floor utilizing two ripsaws, neither of which was the Producto saw that had been specially purchased for the project. Cal–Tex, however, did not accept or respond to this offer. Third, a letter from Owens Co.'s attorney on February 22, 1994 reflects a final scheduled meeting for March 2, 1994. At that meeting, Owens suggested that his company simply be allowed to cut edging strips to length. This process would simplify its function at Cal–Tex even further in that Owens Co. would change neither the width nor the thickness of the strips at Cal–Tex, but instead, Owens Co. would cut the strips to length and transport them to a location across the street for ripping, and then pay Cal–Tex by the ton. Cal–Tex rejected this proposal without stating a reason. These refusals by Cal–Tex to allow Owens Co. to install equipment and proceed with production indicate additional breaches of contract by Cal–Tex.

Furthermore, sometime after July 22, 1993, Cal–Tex furnished Owens Co. with a proposed new contract. Owens stated that upon receiving it, he was stunned by it. Owens stated that the terms were extremely harsh and unacceptable; the contract was

entirely different, and not merely refined as Patterson had suggested. When cross-examined about their September 1993 conference concerning the new contract that Cal–Tex proposed, Owens testified as follows:

> [W]e went through this item by item. And, the crux of it was, what's going to happen to all this money we spent, Art? And he said, frankly I don't care cause [sic] for whatever you spent we spent a whole lot more. We're not going to pay you a dime. Said, this is it. **You can forget the old contract. It's this or nothing. So, that tells me—He's setting the old one aside.** They were not going to, not going to go by that unless it has all these onerous terms .... (emphasis added).

Such a demand by Cal–Tex constituted a repudiation of the 1990 contract, and only Owens Co.'s nonacceptance of the repudiation kept the 1990 contract alive. *Griffith v. Porter,* 817 S.W.2d 131, 135 (Tex.App.—Tyler 1991, no writ).

For these reasons, Cal–Tex's waiver argument is overruled.

### C. FACTUAL INSUFFICIENCY OF EVIDENCE ON BREACH OF CONTRACT

Finally, in a single sentence, Cal–Tex also asserts in its request for relief, that we should grant its motion for new trial on grounds that the evidence is factually insufficient to establish a breach of contract. On a factually sufficiency point such as is presented here, it was Cal–Tex's duty to demonstrate that the evidence is insufficient to support the adverse finding. *See Hickey v. Couchman,* 797 S.W.2d 103, 109 (Tex.App.—Corpus Christi 1990, writ denied). As, Cal–Tex has presented no recitation of evidence supporting its complaint and has presented neither argument nor authority in support of this contention as required under TEX.R.APP. P. 74(f), the point has been waived. *St. Paul Surplus Lines Ins. Co., Inc. v. Dal–Worth Tank Co., Inc.,* 917 S.W.2d 29, 54 (Tex. App.—Amarillo 1995, rev'd in part on other grounds). In the interest of justice, however, having already reviewed the entire record, we conclude that from the evidence adduced at trial, the evidence in support of the jury's breach of contract finding is not so weak as to be clearly wrong and manifestly unjust. Consequently, Cal–Tex's factual sufficiency argument is likewise without merit. Point one is overruled.

### III. CHALLENGE TO SUBMISSION UNDER DTPA THEORY

In its second point of error, Cal–Tex asserts that the trial court erred in submitting Questions 3 through 6 on Owens Co.'s DTPA claim because there was no evidence that Cal–Tex represented that the parties' contract conferred or involved rights that it did not have, or that Owens Co. admitted through its vice president, Bill Owens, that Cal–Tex did not represent the parties' contract conferred or involved rights that it did not have. Although Cal–Tex presents no argument in support of these assertions, in a footnote to its brief, Cal–Tex asserts that the sole purpose for asserting this point is to avoid application of a mandatory fall-back theory under *Birchfield v. Texarkana Memorial Hosp.,* 747 S.W.2d 361, 367 (Tex.1987). In *Birchfield,* the plaintiffs had failed to unequivocally waive the jury's findings on exemplary damages in their suit for negligence and DTPA actions. Thereafter, on appeal, they argued that they were entitled to elect whether they would recover exemplary or treble damages. The court of appeals held that they had waived their complaint concerning their right to recover treble damages by failing, before entry of judgment, to waive the findings on exemplary damages. The supreme court, however, disagreed holding that where no election is made, "the judgment of the court should be 'so framed as to give the party *all the relief* to which he may be entitled'....[W]here the prevailing party fails to elect between alternative measures of damages, the court should utilize the findings affording the greater recovery and enter judgment accordingly." *Id.,* at 367 (alteration in original) (citation omitted).

In the instant case, Owens Co. did make an affirmative election prior to entry of judgment stating: "This was a breach of contract case and DTPA action. The plaintiff has elected or chose[n] to seek recovery based on contract rather than DTPA." Further, as

Owens Co. points out, no finding on the DTPA action was necessary to support the judgment. Since on appeal, Owens Co. has not asserted a right to recover damages under the jury's DTPA findings, and Cal–Tex has neither presented argument nor case authorities in support of its factual and legal sufficiency challenges, we overrule this second point of error without further discussion.

## IV. CHALLENGES TO AWARD FOR DAMAGES

 In points three through five, Cal–Tex presents various attacks on the jury's lump sum damages award, contained in its response to Questions 2, 3 and 4[10] of the court's charge.[11] Question No. 2 of the charge states:

> What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Owens Handle Company, Inc. for its damages, if any, that resulted from such breach?
>
> Consider the following elements of damages, if any, and none other.
>
> > The difference between the amount paid by Owens Handle Company, Inc. for equipment for use in connection with operations at Cal–Tex Lumber Company, Inc., less its current benefit to Owens Handle Company, Inc.
> >
> > The cost and expense which was incurred by Owens Handle Company, Inc. for professional service and management time expended to perform under its contract with Cal–Tex Lumber Company, Inc.
> >
> > Lost profits, if any, during the 5 year term of the contract that were a natural, probable, and foreseeable consequence of Cal–Tex Lumber Company, Inc.'s breach.
>
> Do not add any amount for interest or past damages, if any.

10. Questions 3 and 4 pertain to Owens Co.'s DTPA action. Since, as noted above, Owens Co. elected to recover under breach of contract, we will limit our review to Question 2.

11. Because Cal–Tex does not align its arguments with the points as initially set forth in its brief, we will respond to Cal–Tex's complaints as actually presented and argued.

Answer in dollars and cents.

Answer: $ *1,299,445.00* .

[The trial court's instructions relating to proximate cause are not recited here.]

The evidence shows that Owens Co. sought a total of $2,445,570. in actual damages based upon the elements set forth above. The jury, however, awarded damages in the sum of $1,299,445. Cal–Tex argues that for the reasons set forth below, Owens Co. was not entitled to recover in the amount found by the jury under these elements of damages, and consequently, Cal–Tex is entitled to either entry of a take-nothing judgment or a new trial.

Certain difficulties arise in reviewing an attack on a lump-sum damages award where the jury has been instructed to consider several different elements of damages and then find a single answer to the damages question. The court in *Greater Houston Transp. Co., Inc. v. Zrubeck*, 850 S.W.2d 579, 589 (Tex. App.—Corpus Christi 1993, writ denied), explained the difficulty of addressing such complaints as follows:

> The problem this Court faces is that, when a damages issue is submitted in broad-form, an appellate court cannot ascertain with certainty what amount of the damages award is attributable to each element. *See Kansas City Southern Ry. Co. v. Carter*, 778 S.W.2d 911, 916 (Tex.App.—Texarkana 1989, writ denied). . . . Thus, under the current practice, a meaningful review on appeal of damages questions submitted in broad-form is extremely difficult. (n. 11 omitted).

*Id.* Thus, the *Zrubeck* court suggests that the only way a defendant can successfully attack a multi-element damages award on appeal is to address each and every element and show that not a single element is supported by sufficient evidence. *Id.*[12] It further notes,

12. The facts presented in the instant case appear to present an exception to this general pronouncement made in *Zrubeck*. In many cases, it is possible that the jury could have awarded the entire amount of damages on the basis of any one or more of the elements of damages, *see e.g. K Mart Corp. v. Rhyne*, 932 S.W.2d 140, 144 (Tex.App.—Texarkana 1996, no writ), *Zrubeck, supra;* thus, as explained above, the appellant must attack each element of damages in order to

however, that "[i]f there is just one element that is supported by the evidence, the damages award will be affirmed *if* it is supported by the evidence." *Id.* (emphasis added); *See Pitman v. Lightfoot,* 937 S.W.2d 496 (Tex. App.—San Antonio 1996, writ denied); *Amelia's Automotive, Inc. v. Rodriguez,* 921 S.W.2d 767, 771 (Tex.App.—San Antonio 1996, no writ).

In the instant case, Cal–Tex did not object to the court's broad form submission on the damages issue as required by Tex.R. Civ. P. 274. *Spencer v. Eagle Star Ins. Co.,* 876 S.W.2d 154 (Tex.1994). Although Cal–Tex filed requested jury questions and instructions, its proposed questions on damages were clustered toward the last of nine pages of other instructions and questions and provided no separate blanks for ruling on such requested items. Moreover, at the charge conference, Cal–Tex tendered its requested questions and instructions and informed the court that it would refer to them when making objections. Despite this representation, the only request to which the court's attention was directed pertained to instructions on Question No. 1, breach of contract. Thus, from the record, we conclude that Cal–Tex's request neither satisfied Tex.R. Civ. P. 274 nor *State Dept. of Highways & Pub. Transp. v. Payne's* "instruction" that Cal–Tex make the trial court "aware of the complaint timely and plainly" and obtain a ruling thereon. 838 S.W.2d 235, 241 (Tex.1992).

Moreover, with the exception of Cal–Tex's complaint that the issue of lost profits was as a matter of law too speculative to have been submitted, Cal–Tex has waived its legal sufficiency complaints as to specific elements of damages. Consequently, on all but lost profits, we are limited to a factual sufficiency review of damages. Because, however, the jury's damage award turns on the issue of lost profits, we will first address Cal–Tex's lost profits complaints.[13]

## A. LOST PROFITS

In determining a legal sufficiency question, we must consider only the evidence and inferences that tend to support the finding, and disregard all evidence and inferences to the contrary. *Holt Atherton Indus., Inc. v. Heine,* 835 S.W.2d 80 at 84 (Tex.1992). If there is more than a scintilla of evidence to support the finding, the no-evidence challenge fails. *Id.*

 The rule for recovery of lost profits, routinely relied upon by the supreme court was annunciated in *Southwest Battery Corp. v. Owen,* 131 Tex. 423, 115 S.W.2d 1097, 1098–1099 (1938):

> The rule as announced by the decisions of the courts of this state is summarized ... as follows: 'In order that a recovery may be had on account of loss of profits, the amount of the loss must be shown by competent evidence with reasonable certainty. Where the business is shown to have been already established and making a profit at the time when the contract was breached or the tort committed, such pre-existing profit, together with other facts and circumstances, may indicate with reasonable certainty the amount of profits lost. It is permissible to show the amount of business done by the plaintiff in a corresponding period of time not too remote, and the business during the time for which recovery is sought. Furthermore, in calculating the plaintiff's loss, it is proper to consider the normal increase in business which might have been expected in the light of past development and existing conditions.' (citation omitted).

ensure that no basis for the jury's award remains unchallenged. In the instant case, however, the "lost profits" element is a *sine qua non* of the jury's damages award: Without sufficient evidence of lost profits, even favorable findings on the remaining elements, which are based upon liquidated damages claims, cannot support the jury's award. Thus, in such situations, it appears that the Appellant need only successfully attack the indispensable element of damages in order to prevail on appeal.

13. Owens Co. sought the following amounts for damages under the categories set forth in Question No. 2:(1) $50,596 for Equipment; (2) $175,041 for Engineering and Management Costs and Services; and (3) $2,196,250 for lost profits. Given that equipment costs, engineering and management expenses combined total only $249,320, it becomes apparent that a significant portion of the jury's lump sum award of $1,299,445 was found to be lost profits.

In the early decisions a rigid rule affecting the right of recovery for lost profits was announced. Modern business methods have caused a relaxation of that hard rule. (citations omitted).

The rule denying a recovery where the facts show that such profits claimed are too uncertain or speculative, or where the enterprise is new or unestablished, is still enforced, on the ground that the profits which might have been made from such businesses are not susceptible of being established by proof to that degree of certainty which the law demands. (citations omitted).

As later noted by the supreme court in *Texas Instruments v. Teletron Energy Management, Inc.,* " '[ R]easonable certainty' in proof of lost profits is intended to be flexible enough to accommodate the myriad circumstances in which claims for lost profits arise." 877 S.W.2d 276, 279 (Tex.1994). The court further noted that whether lost profits should be characterized as "speculative and remote" depends totally on the facts and circumstances of each case. *Id.* Profits which are too speculative to be recoverable are those, for instance dependent upon: (1) uncertain or changing market conditions; (2) chancy business opportunities; (3) promotion of untested products; (4) unknown or unviable markets; and/or (5) the success of an unproven enterprise. *Id.* Where new or unestablished businesses are concerned, the issue is whether the profits which might have been made from such businesses are susceptible of being established by proof to that degree of certainty which the law demands. *Id.,* at 280; *Southwest Battery.* While the realistic hope of success for a new business is not enough for recovery of lost profits, when there are "firmer reasons to expect a business to yield a profit, the enterprise is not prohibited from recovery merely because it is new." *Teletron,* 877 S.W.2d at 280. Where, as here, lost profits are claimed for damage to a business activity rather than a business entity, they should not be denied simply because the activity was conducted by a subsidiary newly formed for that purpose. *Id.* In such cases, the focus is on the "experience of the persons involved in the enterprise, the nature of the activity, and the relevant mar-

ket." *Id.* At a minimum, however, opinions or estimates of lost profits must be based upon objective facts, figures, or data from which the amount of lost profits can be ascertained. *Holt Atherton,* 835 S.W.2d at 84. Furthermore, lost profits must be based upon one complete calculation. *Id.*; *Szczepanik v. First Southern Trust Co.,* 883 S.W.2d 648, 650 (Tex.1994).

### Evidence of Owens Co.'s Status as a Proven Enterprise:

At trial, Owens testified that Owens Co. had been in the wooden handle business since 1948. Owens stated that a strong market existed for their product and that sales had never been a problem because of the great demand for wooden handles. He further testified that for a number of years, Owens Co. had been operating wood square retrieval operations in a number of area mills. Owens, however, stated that they had been battling a supply problem for many years; consequently, the contract with Cal–Tex for edging strips was attractive to his company.

### Evidence that Cal–Tex Was Producing Ample Raw Materials for Handles

At the time Owens Co. entered into the 1988 contract, Owens had been told by Ogletree to expect an average output from the mill of 200,000 to 250,000 board feet of lumber production per day. Through discovery, however, Owens learned that Cal–Tex's average daily output was in excess of 315,000 board feet per day. Discovery additionally revealed that Cal–Tex was indeed producing edging strips and those were being sold to Patterson Wood Products for approximately $36,000 per month. Owens stated that the invoices to Patterson Wood Products verified his earlier projections that there was indeed a supply of edging strips in the Cal–Tex sawmill that would make their wood squares project feasible.

Larry Owens testified that he was present on the day Owens Co. ran its sample run at Cal–Tex, and by his observation, the Cal–Tex mill was producing ten times the amount of wood of an average sawmill. He further testified that on the sample day, Owens Co.

was only able to retrieve about seventy-five percent of what it would have gotten from one of three troughs had it been permanently established and run the squares operation a full day. Ogletree testified that when the mill was under construction, he designed it with the expectation that Owens Co. would use *all* available edging strips for pine squares.

Kelsie Roach, whose company designed the Cal–Tex sawmill as well as various layouts for the squares operation, testified that he had done a feasibility study for the installation of a squares operation in the Cal–Tex mill and had determined that it was a "win-win" situation for both companies. Roach's feasibility study, introduced as Defendant's Exhibit 8, established that Cal–Tex would make approximately $211,600 per year by selling its edging strips to Owens for pine squares rather than running the strips through a wood chipper. He stated that at one point, he made calculations based upon an estimated production of 100,000 pine squares per day which would have given Cal–Tex an over all revenue increase of $163,000. He, however, later learned that pine square production was going to be closer to 150,000 pine squares per day. Thus, he stated that as a consequence, both Cal–Tex and Owens Co. were going to have an even "bigger win" which he described as "evenly" better for both parties. Roach stated that his feasibility studies were based upon Owens Co.'s use of all suitable by-products from the Cal–Tex mill.

Alfred Lindsey Hansen [14], Owens Co.'s expert witness on the wooden handle industry, testified that he was not concerned by the absence of a commencement date or minimum quantity in the parties' contracts. He stated that people who knew each other well would have had an oral or implicit understanding as to when production was to commence, and if no minimum or maximum quantity was stated in the contract, he would assume it meant that they were purchasing all the pine squares produced. Hansen stated that he had many similar agreements with

sawmills that produce squares for him in Honduras.

### Evidence of a Ready Market for the Sale of Additional Handles

Hansen testified that based upon industry information, knowledge of the cost of producing a finished handle, and knowledge about Owens Co.'s operations, it was his opinion that Owens Co. could have used the pine squares produced at Cal–Tex to make a profit under the pricing agreement it had with Cal–Tex. He further stated that during the entire time period in question—between 1990 and the time of trial—the domestic market for handles has been such that a manufacturer could always have made a profit producing handles from blanks using prices like those in the pricing agreement. Hansen explained that during that time, manufacturers aggressively sought to get all of the pine squares they could secure. Furthermore, when asked his opinion as to whether Owens Co. could have sold three to four million more handles per year between 1990 and 1995 if it had received enough raw materials from Cal–Tex to produce that many, Hansen replied: "[M]y opinion is this: If Bill Owens could have had that per month, he would have sold it. Not per year, but per month ... that would be nothing to sell in a year."

Additionally, in excerpts from Schmidbauer's deposition, he testified that there had been no dramatic change in the supply and demand of certain types of products, which would have made the parties' contract no longer feasible or practical.

### Evidence of Owens Co.'s Lost Profits Calculations

Owens Co.'s accounting expert, Sammy L. Smith, Ph.D., a professor of accounting at Stephen F. Austin State University ("SFA-SU"), proffered evidence on behalf of Owens Co. as to the profits it lost as a result of Cal–Tex's breach of contract. Smith described the following steps in reaching his lost profits calculation:

14. Hansen is the President of Hansen–Pringle Corporation, a forty-three year old forest products business that manufactures doweled handles used in six different industries. Additionally the company has an import business which brings wooden handles into the United States.

1. From Cal–Tex's production data between July of 1990 and February of 1995, Smith first calculated Cal–Tex's average daily production run: 316,877 board feet per day.

2. Next, based upon the sample run by Owens Co. in October of 1992, Smith calculated that there was enough raw material coming out of Cal–Tex's run to produce .049309 handles per board foot of lumber. Thus, Owens Co. could produce approximately one handle for every 200 board feet of lumber produced by Cal–Tex. Smith further stated that Owens had verified this calculation as being consistent with information he had obtained from his operations at the Ogletree mill, which evidently also used the kerf saw method.

3. Smith then multiplied 316,877 board feet of lumber per day by .049309 handles per board foot of lumber, which equaled 15,625 handles per day.[15]

4. Smith then determined the contribution margin per handle—amount of net profit Owens Co. would make per handle. In making this calculation he first determined Owens Co. variable overhead by preparing a statistical review of Owens Co.'s financial statements from 1980 through 1995, reviewing documentation reflecting increased costs of raw materials, labor, various supplies, and other increases in overhead. Based upon his calculations, Smith determined that the contribution margin was .115 dollars or 1½ cents per handle.

5. Smith then multiplied the estimated number of additional handles Owens Co. would have produced per day (15,625) at Cal–Tex times the contribution margin per handle ($.115) and determined that the increase in net income would have been $1,797 per production day.

6. Since there are approximately 250 production days each year, he then multiplied the per diem profit times 250 and concluded that the estimated contribution margin for the year was $449,250.

7. Finally, Smith factored in one additional cost to Owens Co., for depreciation costs of the equipment. He stated that Owens had invested approximately $125,000 on the equipment and that the equipment would last from eight to ten years. Thus, Smith estimated that the equipment would depreciate at the rate of $10,000 per year.

8. Smith thus subtracted $10,000 per year from the annual contribution margin of $449,250 and concluded that Owens Co. would have made an estimated annual net profit of $439,250 under its production contract with Cal–Tex.[16]

Smith then testified that he had projected the company's increased profitability forty years into the future. While he also stated that in making any calculations beyond the first year, he had to apply an inflation factor and make some basic assumptions about the company's performance, he did not ever present calculations applying those factors or present his estimate as to the total amount of lost profits under the contract. He then agreed that beyond the first three years of the pricing agreement, the cost of raw materials, market conditions and other factors could fluctuate and thus affect Owens Co.'s projected profits. Smith further stated that the $439,250, "would [be] the first year's income. That's the only thing I testified to." Subsequently, Smith twice again reiterated that his calculations regarding the $439,250 figure pertained to Owens Co.'s "profits for the first year."

15. In calculating Owens Co.'s profits, Smith stated he assumed that Owens Co. would use all available raw materials produced by Cal–Tex.

16. Smith stated that from his review of Owens Co.'s records, it appeared that Owens Co. was an "old line fairly stable company." This $439,250 would have had a dramatic impact on net income and would have constituted "almost all profit" since over the last fifteen years Owens Co. had been earning just enough to pay its officers and otherwise break even. When questioned about financial losses reported by Owens Co. in the past, Smith stated that those appeared, for the most part, to arise from a significant decrease in Owens Co.'s inventory.

### Evidence Presented by Cal–Tex's Expert

*(Germaine to Cal–Tex's Factual Sufficiency Challenge)*

Cal–Tex's expert witness, Gary Douglas Conrad, Ph.D., a professor of forestry at SFASU, stated that he had not examined data or documentation pertaining to Owens Co., Cal–Tex, or other mills in preparation for his testimony. Moreover, he presented no alternative proposal for Owens Co.'s lost profits but attacked the assumptions and data used by Smith in preparing his calculations. Conrad testified that Smith's estimates concerning the contribution factor per handle produced from Cal–Tex's raw materials were based on variable overhead obtained from Owens Co.'s costs, labor, overhead, etc. incurred by producing wood squares and handles from the Ogletree mill which was less efficient than Cal–Tex.[17] He stated that the use of false data resulted in false projections. Conrad stated, for example, that overhead from Cal–Tex would in all likelihood be higher as a result of increased labor costs, such as the difficulty of sorting Cal–Tex's raw materials for useable edging strips, etc. He thus concluded that any projections made by Smith were too speculative in nature. Conrad further stated that there were simply too many variables to make calculation of lost profits possible.

On cross-examination, however, Conrad stated that he believed Smith had testified that he got both his "handles per board foot of lumber" number as well as his variable overhead costs from Owens Co.'s operations at the Ogletree mill. He further testified that he was under the incorrect impression that Owens Co. had not initially planned to provide labor. He, however, stated that Owens Co.'s labor costs would be higher at the Cal–Tex mill because you have to handle a lot of "skinny" pieces of wood to make squares; whereas in other mills, you moved fewer big pieces of wood, and they were more easily turned into squares. Additionally, he stated that he disagreed with Hansen's unequivocal statement that Owens Co. could sell as many handles as they could produce because that statement did not make economic sense given the law of supply and demand. Conrad testified that a better way to have collected data for calculating lost profits would have been to collect a week's sample at Cal–Tex then take information from the Ogletree mill and "make adjustments for all of the adjustments that needed to be made for the Cal–Tex mill.... But that's a complicated process." Conrad further stated that even if Owens knew the cost of his raw materials, what handles would sell for, his company's fixed costs for processing the pine squares back at his own plant and could reasonably estimate his costs for labor, insurance, freight, from the Cal–Tex mill, he still could not calculate lost profits because he did not know how much raw material his employees would be able to collect from Cal–Tex. Conrad stated that if Owens Co. had been able to operate six weeks or six months at Cal–Tex, then it would have had some basis for projecting lost profits.

### Owens Co.'s Rebuttal Evidence on Lost Profits

On rebuttal, Owens testified that contrary to Conrad's belief, he had given Smith no information on the Ogletree mill from which Smith was to make his calculations. Owens further disagreed with Conrad's opinion that labor costs at Cal–Tex would have been higher than they were elsewhere. Owens explained that costs were based upon a ratio of people to production. At the Ogletree mill for instance, Owens had three people involved making approximately 25,000 squares per week, whereas at the Cal–Tex mill, using the upper floor layout, they had allocated eight people making between eighty and a hundred thousand squares per week. "[W]hen you break it down to the cost per man per day divided by the units, which is in this case squares, the price per thousand squares, there's a differential of $75.00 per thousand squares," and "it's lower at Cal–Tex."

---

**17.** It should be noted, however, that Owens had previously testified that he had been obtaining his raw materials from several different sources.

821

Using a governmental publication from Louisiana State University published in cooperation with the U.S. Department of Agriculture routinely used in the sawmill industry, Owens further testified that his sample from Cal–Tex was reliable. Using pertinent conversion charts from the governmental publication and information supplied to Owens by Cal–Tex as to its actual output of board feet on October 5, 1992, i.e. 384,514 board feet, Owens showed that the governmental publication calculated that he could expect 20,507 one-by-one, eight-foot squares from Cal–Tex based upon Cal–Tex's daily output. He then compared this number obtained via the conversion charts with the calculations he had made from the actual number of squares obtained from Owens Co.'s October 5th sample. His calculations based upon Owens Co.'s sample showed that Owens Co.'s production would have been approximately 18,-960 [18] squares, a number remarkably close to that achieved through the conversion charts.

## ANALYSIS OF LOST PROFITS UNDER LEGAL SUFFICIENCY COMPLAINT

■ Cal–Tex first argues that the evidence is legally insufficient to support the jury's award of lost profits because Owens Co. failed to provide one complete calculation for lost profits during the five year term of the contract. We agree. While based upon the above-cited authorities, the evidence was legally sufficient to establish objectively and within a reasonable certainty that Owens Co. lost $439,250 in profits its first year under the contract, no evidence as to the total amount of lost profits sustained over the five year contract term was ever introduced. Consequently, total lost profits cannot be calculated with reasonable certainty. *Szczepanik*, 883 S.W.2d at 649.

While Smith stated that he had projected profits forty years into the future, no evidence of those calculations or projections was introduced. Moreover, when questioned about actual lost profits for years two

through five, he stated that in order to make calculations for those years, he would have to apply an inflation factor and make some basic assumptions about the company's performance. Smith, however, never actually presented any evidence of his calculations or estimates of Owens Co.'s lost profits for years two through five of the contract. In fact, he repeatedly stated, that the scope of his testimony regarding the $439,250 calculation related solely to Owens Co.'s first year of profits. Thus, no evidence of Smith's calculation for total lost profits under the five year contract was ever introduced. *See Holt Atherton*, 835 S.W.2d at 84.

Since the evidence was legally insufficient to sustain an award of lost profits in excess of $439,250, even if we were to find that the jury properly awarded Owens Co. the full $249,320 under the other elements of damages, the aggregate award of damages for all elements set forth in Question No. 2 would have totaled only $688,570. Consequently, the evidence is insufficient to support the jury's lump-sum award of $1,299,445 in damages. Thus, we conclude that the lost profits evidence in this case does not satisfy the reasonable certainty standard. Accordingly, we sustain point three.

## V. CONCLUSION

Because of our holding, we need not address Cal–Tex's remaining arguments. Although not in an amount sufficient to sustain the jury's lump-sum damages award, Owens Co. has provided evidence of some lost profits; consequently, **we reverse the trial court's judgment and remand the cause for a new trial.** *Texarkana Memorial Hospital v. Murdock*, 946 S.W.2d 836, 841 (Tex. 1997).

**18.** As Owens noted, Larry Owens estimated that on October 5, 1992, working only a partial day with a partial crew and temporarily installed equipment, Owens Co. retrieved 70–75% of the total production off of one of three troughs at Cal–Tex and produced 4,740 squares. When multiplied by three troughs, production equals 14,220 squares. Then, when an additional 25% of production is factored in, total estimated production from the raw materials actually retrieved equals 18,960 squares.